UNITED STATES, Appellee,

v.

Thomas E. KNEELAND, Jr., Defendant, Appellant.

No. 96–2158.

United States Court of Appeals, First Circuit.

Heard Jan. 7, 1998.

Decided June 23, 1998.

---

Michael C. Bourbeau, with whom Bourbeau & Bourbeau, Bonilla, Tocchio & Floyd, LLP was on brief, for appellant.

Daniel S. Goodman, Attorney, with whom Jonathan L. Kotlier, Assistant United States Attorney, and Donald K. Stern, United States Attorney, were on brief, for appellant.

Before STAHL, Circuit Judge, CYR, Senior Circuit Judge, and SHADUR,* Senior District Judge.

STAHL, Circuit Judge.

Following a jury trial, defendant-appellant Thomas E. Kneeland, Jr. was convicted of conspiracy, mail fraud, wire fraud, money laundering, and criminal forfeiture for his role in a fraudulent scheme to solicit borrowers to pay "advance fees" in connection with loan transactions that defendant never intended to consummate. Kneeland appeals his convictions, asserting that the district court unconstitutionally deprived him of his Sixth Amendment right to counsel. He also challenges his sentence on various grounds. We affirm the convictions and the sentence.

## I.

From 1992 until March 1994, Thomas E. Kneeland, Jr. and his partner, Brian Kelly, ran an "advance fee" scheme in which they falsely represented themselves as experienced lenders backed by Japanese and Greek investors. Under this pretense, they solicited clients needing financing for commercial real estate projects. Kneeland and Kelly furthered the scheme through a corporation named Nippon–American Funding, Inc. ("Nippon"), which Kneeland had previously formed with two other individuals, and through a Canadian corporation called Societe Kokusai Les Investissements, S.A. ("Societe Kokusai").

With the object of enticing victims to pay advance fees in the expectation of receiving commercial loans, Kneeland and Kelly advertised in major newspapers, seeking both borrowers and brokers. Potential borrowers submitted to Kneeland and Kelly or to a broker a description of the project for which they sought financing, and shortly thereafter Kneeland or one of his brokers responded, telling the would-be borrowers that they had received preliminary approval from the Nippon Board of Directors or from the Nippon Finance Committee. In fact, neither board existed. Subsequently, the borrowers met with Kneeland and Kelly. Within a few days after that meeting, Nippon (or Societe Kokusai) sent the borrowers contracts of acceptance, informing them that the only other requirements before funding were site inspections, underwriting, and due diligence reports, for which there would be a fee. If borrowers questioned the amount of the fee as unreasonably high, Kneeland and Kelly told them that part of the fee went toward "block[ing] out funds with the investor" until the underwriting process was completed.

After site inspections and due diligence had been conducted, Kneeland and Kelly issued borrowers commitment letters and charged "commitment fees," which were described in the letters as being "fully refundable at closing from the loan proceeds." The agreements also provided, however, that the fee "shall be deemed to be earned immediately by the lender in consideration of the preparation of the issuance of the commitment." In addition, if there were no closing, the commitment fee would not be refunded. Kneeland and Kelly led borrowers to believe that they would obtain funding within thirty days if they paid the commitment fee.

Kneeland and Kelly then employed various strategies to enable Nippon or Societe Kokusai to back out of the promised loan transactions without refunding the borrowers' fees. Seventeen groups of borrowers fell prey to the scheme, sending to Kneeland and Kelly thirty-eight checks totaling $593,520.71. Kneeland and Kelly did not endeavor to obtain funding for any of the borrowers until the FBI had begun an investigation of the scheme.

Kneeland was arrested on March 31, 1994, and his assets were civilly seized at the same time. Although the district court appointed an attorney to represent him, he dismissed that attorney as well as two others subse-

---

* Of the Northern District of Illinois, sitting by designation.

quently appointed by the court. After the third dismissal, the district court declined to appoint a fourth attorney. Appearing pro se, Kneeland was tried before a jury in the United States District Court for the District of Massachusetts, and was convicted on one count of conspiracy, in violation of 18 U.S.C. § 371; three counts of mail fraud, in violation of 18 U.S.C. § 1341; twenty-nine counts of wire fraud, in violation of 18 U.S.C. § 1343; twenty-nine counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A); twenty-five counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B); eight counts of money laundering, in violation of 18 U.S.C. § 1957(a); and one count of criminal forfeiture, in violation of 18 U.S.C. § 982. The district court, pursuant to section 3B1.1 of the sentencing guidelines, applied a four-level enhancement to the fraud counts for Kneeland's role as a leader or organizer in the offenses and rejected Kneeland's request that the fraud and money laundering counts be grouped together under U.S.S.G. § 3D1.2. It sentenced him to ninety-seven months' imprisonment, to be followed by three years' supervised release, and ordered him to pay restitution of $576,895.71 and, pursuant to 18 U.S.C. § 3013, a special assessment of $4,750.

## II.

On appeal, Kneeland argues (1) that he was denied his Sixth Amendment right to effective assistance of counsel when the district court declined to appoint a fourth attorney to represent him at trial; (2) that the district court erred in failing to group together the fraud and money laundering charges under U.S.S.G. § 3D2.1; (3) that the court erred in applying U.S.S.G. § 3B1.1, which permits a four-level enhancement if a defendant was an organizer or leader in an offense; and (4) that there was insufficient evidence as a matter of law to sustain his convictions for money laundering under 18 U.S.C. § 1956(a)(1)(B).

### 1. Effective Assistance of Counsel

Kneeland asserts that, because he never implicitly or explicitly waived his Sixth Amendment right to be represented by coun-

sel, the district court denied him that right by declining to appoint a fourth attorney after he had requested the dismissal of the first three, thereby forcing him to represent himself. In particular, he asserts that the district court erred by failing to make an adequate inquiry into his desire and ability to represent himself and his awareness of the consequences of proceeding pro se. Under such circumstances, he contends, he cannot be regarded as having clearly and unequivocally waived his right to counsel. Additionally, he argues that the district court abused its discretion in refusing to delay the trial after his third attorney had been dismissed and in declining to appoint standby counsel over his own objections to such an appointment. Kneeland's arguments are without merit.

After his arrest, Kneeland at first stated that he preferred to proceed pro se, rather than through counsel appointed under the Criminal Justice Act, see 18 U.S.C. § 3006A. Apparently, after thinking better of it, he later informed the court that he wished to have appointed counsel. The court then appointed Charles P. McGinty, a federal public defender, to represent him. On October 17, 1994, three weeks prior to the scheduled trial date, Kneeland filed a motion captioned "motion to dismiss counsel, recuse judge & appoint new counsel." The following week, the district court denied the recusal motion, granted Kneeland's request for new counsel, allowed McGinty to withdraw from the case, and set a new trial date of May 22, 1995.

On December 6, 1994, the court appointed Max W. Beck, an attorney on the Criminal Justice Panel, as Kneeland's new counsel. On May 2, 1995, fewer than three weeks prior to his new trial date, Kneeland filed a motion for Beck to withdraw as his attorney, claiming that Beck had improperly "refus[ed] to file a motion for double jeopardy." The district court directed Kneeland to undergo a psychiatric examination to determine his mental competency. After a psychologist reported that Kneeland's difficulties with his counsel were not the product of a mental defect or illness and that Kneeland was competent to stand trial, the court appointed a

third attorney, Roger A. Cox. Trial was rescheduled for January 2, 1996.

On August 11, 1995, Cox appeared as Kneeland's new lawyer, and, on November 15, 1995, Kneeland sought termination of Cox's services. On December 13, 1995, Kneeland requested a "*Monsanto* hearing" in order to obtain properties subject to the parallel civil forfeiture proceeding to pay for his own attorney. On December 19, 1995, the district court allowed Cox to withdraw as Kneeland's attorney and postponed the trial until January 22, 1996, but told Kneeland that no additional counsel would be afforded him. Although the court suggested that Cox act as standby counsel if Kneeland decided to proceed pro se, Kneeland refused that offer. The district court postponed the trial another week to allow this court to consider Kneeland's interlocutory appeal of the district court's denial of his motion on an issue unrelated to this appeal, but it denied his request for an additional continuance of 125 days. On January 25, 1996, the court denied Kneeland's motion for a so-called *Monsanto* hearing regarding the funds subject to civil forfeiture. Kneeland then proceeded to trial without the assistance of counsel.[1]

■ Because of the disadvantages to a defendant that inure from pro se representation, a defendant must "knowingly and intelligently" waive his right to counsel before he may be permitted to proceed pro se. *Johnson v. Zerbst*, 304 U.S. 458, 464–65, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). A defendant's decision in this regard is reasonably regarded as knowing and intelligent if he has been "made aware of the dangers and disadvantages of self-representation, so that the rec-

ord will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942)).

■ After carefully reviewing the record, we are confident that Kneeland effectively waived his right to counsel. First, his waiver was express and knowing. The district court conducted multiple pre-trial hearings at which the representation issue was addressed. In those hearings, the court explicitly warned Kneeland that without counsel he would "be at a significant disadvantage," that trying the case pro se was his "least attractive" alternative, and that he was "far better served by—at a minimum—having standby counsel available" for consultation. The record shows that Kneeland accepted and understood the reasons behind the district court's explicit warnings regarding the dismissal of Cox: after the district court informed Kneeland that "no additional counsel will be afforded to you other than the three who have been afforded to you so far," Kneeland responded, "I don't think I'm entitled to it." Although Kneeland initially stated that he "did not want to go pro se, but [did not] want to use Mr. Cox," his ultimate decision to proceed pro se was an unambiguous expression of his preference.

■ We note that it was entirely proper for the trial court to require Kneeland to choose between proceeding to trial with his present attorney and representing himself. *See Maynard v. Meachum*, 545 F.2d 273, 278

---

1. Kneeland opaquely argues that the district court exceeded its discretion in declining to hold an adversarial hearing to determine whether some of Kneeland's assets that had been seized or restrained by the government in a parallel civil forfeiture action should have been released to him to allow him to retain private defense counsel. This argument need not detain us because the civil forfeiture action against Kneeland was dismissed without prejudice at the government's request after the government moved in the criminal case for new warrants freezing the same properties. In this court's affirmance of the dismissal in March 1996, *see United States v. All Funds, Monies*, 81 F.3d 147, 1996 WL 141789 (1st Cir.1996) (unpublished table decision), we

determined that, because the dismissal obviated any need for an adversarial hearing, Kneeland had not been deprived of any posited right to such a hearing. That holding disposes of Kneeland's contention in this appeal; Kneeland has not disputed the propriety of the seizure of assets in the criminal proceeding. In any event, the Supreme Court has soundly rejected the proposition that the pre-trial seizure of assets that would otherwise be used to pay an attorney implicates the Sixth Amendment. *See Caplin & Drysdale v. United States*, 491 U.S. 617, 626, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989); *United States v. Monsanto*, 491 U.S. 600, 614, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989).

(1st Cir.1976) (holding that the district court may properly give a defendant a choice "between proceeding with counsel already appointed or going pro se"); *see also Tuitt v. Fair,* 822 F.2d 166, 173 n. 1 (1st Cir.1987) (rejecting an argument that a trial court could not properly force a defendant "to choose between proceeding to trial with the unwanted attorney or representing himself"). Thus, the district court was not bound to defer to Kneeland's assertion that he wanted neither to proceed pro se nor to have Cox represent him. By deciding to proceed pro se rather than to accept representation by Cox even in the face of the court's clear admonition, Kneeland knowingly waived his right to counsel. In so holding, we disagree with Kneeland's suggestion that this case is governed by our holding in *Tuitt v. Fair* that, because a defendant's right to counsel is "in a sense" paramount to the right to proceed pro se, a court need not accept a defendant's choice to proceed pro se rather than to be represented by an unwanted attorney, if the choice was not accompanied by an explicit waiver of the right to counsel. 822 F.2d at 177. The question here is not whether Kneeland should have been permitted to exercise his right to self-representation; the question is whether he in fact waived his right to counsel. We answer affirmatively not because he ever stated, in so many words, that he did not want attorney representation, but because he explicitly dismissed his third court-appointed attorney in the face of ample warnings by the district court that he would not be provided a fourth appointed counsel.

Second, the record demonstrates that Kneeland's waiver was intelligent. We held in *Maynard* that,

> there is no particular piece of information that is essential to an effective waiver of counsel. An intelligent waiver does not require that the accused have the skill or knowledge of a lawyer. What is required ... is a sense of the magnitude of the undertaking and ... an awareness that there are technical rules governing the conduct of a trial.... The district court may properly consider, in addition to [the defendant's] background, experience and conduct, such factors as his involvement in previous criminal trials, his representation

by counsel before trial, and the continued presence of advisory counsel at trial....

545 F.2d at 279 (internal citations omitted); *see also United States v. Hafen,* 726 F.2d 21, 25 (1st Cir.1984) (citing *Maynard*). The district court ordered that Kneeland undergo a psychiatric examination to ensure that he understood the consequences of his actions. The psychologist who examined Kneeland concluded that he was "capable of rationally waiving ... the right to counsel," a conclusion that is further supported by the facts that he is a (disbarred) lawyer and therefore cannot have been unaware of the advantages of being represented by counsel, and that, as revealed in the record, his defense was effective, if not successful. During the trial, Kneeland called twelve defense witnesses and cross-examined several of the government's witnesses. He also presented a closing argument in which he attempted to discredit government witnesses as convicted felons who had succumbed to government pressure, pointed to perceived logical fallacies in the government's case, and described his potential borrowers as sophisticated business people who had been rejected by traditional lenders and who acted unreasonably in paying the fees he had charged. Although Kneeland asserts that the court placed undue weight on his legal training and should have made more extensive inquiry into his awareness of the consequences of self-representation, as we have discussed above, the record amply supports the lower court's conclusion that Kneeland was fully aware of the disadvantages he would face as a pro se defendant. No more inquiry was needed.

Of course, we still could not conclude that Kneeland's waiver of counsel was effective if he had a valid reason for needing new appointed counsel—that is, if his waiver was, in effect, involuntary. But Kneeland has made no such showing. A defendant does not, under the Sixth Amendment, have an absolute right to counsel of his own choosing. *See, e.g., United States v. Diaz–Martinez,* 71 F.3d 946, 949 (1st Cir.1995); *United States v. Poulack,* 556 F.2d 83, 86 (1st Cir. 1977). "While a defendant may not be forced to proceed to trial with incompetent or unprepared counsel, a refusal without good

cause to proceed with able appointed counsel is a 'voluntary' waiver." *Maynard*, 545 F.2d at 278 (internal citations omitted). Whether a defendant's decision was voluntary thus depends on whether his objections to his appointed counsel "were such that he had a right to a new appointed counsel." *Id.*

Evaluating the propriety of a trial court's denial of a motion for substitution of counsel requires us to consider such factors as the timeliness of the motion, the adequacy of the district court's inquiry into the defendant's complaint, and whether the conflict between the defendant and his counsel was so great as to have resulted in a total lack of communication, preventing an adequate defense. *See United States v. Allen*, 789 F.2d 90, 92 (1st Cir.1986) (citing *Hudson v. Rushen*, 686 F.2d 826, 829 (9th Cir. 1982)). The district court here conducted an adequate inquiry into Kneeland's reasons for wanting new counsel. Kneeland had filed a lengthy memorandum describing why Cox's representation was inadequate. This memorandum was supplemented by hearings, held in November and December of 1995, in which the district court addressed Kneeland's dissatisfaction with his counsel. We are satisfied that the district court's hearings—combined with its knowledge of Kneeland's history of dismissing counsel—adequately probed Kneeland's position with regard to counsel. The record supports the court's conclusions: notwithstanding Kneeland's complaints that Attorney Cox "failed to do as [Kneeland] instructed [him] to do," there is no indication that Cox's representation was less than competent, or that the dynamic between Kneeland and Cox would prevent an adequate defense. As for whether Kneeland's request for new counsel was timely, Kneeland contends that he requested a change of attorney "as early as November 30, 1995;" the trial at that point was scheduled to begin on January 2, 1996. Although we conclude that the motion was not necessarily untimely, this conclusion does not modify our determination that the district court acted within its discretion in declining to provide substitute counsel.

Proceeding to Kneeland's remaining Sixth Amendment contentions, the district court did not, as Kneeland suggests, abuse its discretion by denying Kneeland's request for a four-month continuance. Although a refusal of a continuance that effectively denies an accused the ability to represent himself may constitute an abuse of discretion and a Sixth Amendment violation, *see Barham v. Powell*, 895 F.2d 19, 22 (1st Cir.1990), the court did not in this case deny Kneeland's request for a continuance but instead postponed the trial until January 22, 1996, and eventually postponed it another week, until January 29. This continuance was only one of many that the court had already granted to accommodate Kneeland's numerous motions to dismiss counsel; Kneeland's trial was originally scheduled to begin on November 7, 1994. In light of these circumstances, we find no abuse of discretion in the district court's decision not to postpone the trial beyond January 29, 1996, more than fourteen months after his trial was originally scheduled to begin.

We also see no error in the trial court's decision not to appoint standby counsel over Kneeland's objections. As the government points out, after Kneeland had clearly expressed his intention to proceed pro se, the district court emphasized that Kneeland would be "at a significant disadvantage" without standby counsel and urged him to accept Cox in that capacity "to discuss things with and to facilitate matters if it becomes necessary during the course of trial." Kneeland rejected this suggestion. Although a trial court may appoint standby counsel against a defendant's wishes, *see Faretta*, 422 U.S. at 834 n. 46, 95 S.Ct. 2525, it is not required to do so, *see United States v. Webster*, 84 F.3d 1056, 1063 (8th Cir.1996) ("Appointment of standby counsel is within the discretion of the district court, and a pro se defendant does not enjoy an absolute right to standby counsel.") (citing *Locks v. Sumner*, 703 F.2d 403, 407 (9th Cir.1983)); *United States v. Nivica*, 887 F.2d 1110, 1121 (1st Cir.1989) ("A defendant has no right to hybrid representation."). That the district court did not appoint backup counsel in the face of Kneeland's objections strikes us as well within its discretion.

In short, we think that the district court went to great lengths to accommodate Kneeland's right to counsel, repeatedly advising Kneeland against proceeding pro se, and suggesting that, at a minimum, he accept standby counsel for consultation purposes. Under these circumstances, Kneeland may be regarded as having knowingly and intelligently waived his right to counsel. The district court did not err in permitting Kneeland to proceed to trial without counsel.

### 2. Grouping Fraud and Money Laundering Counts

Kneeland next argues that the court erred by failing to "group" for sentencing purposes, under subsection (d) of U.S.S.G. § 3D1.2, his fraud and money laundering convictions. The trial court found that, although the money laundering and fraud counts were "to some degree related," they were nonetheless "distinctive" offenses and thus should not be grouped.

▮▮▮ To the extent that this issue implicates the relevant sentencing guideline's legal meaning and scope, our review is *de novo*. *See United States v. Voccola*, 99 F.3d 37, 43 (1st Cir.1996). We defer, however, to the trial court's factual findings unless they are clearly erroneous. *See id.* The introductory commentary to Part D of Chapter 3 of the sentencing guidelines states that "counts that are grouped together are treated as constituting a single offense for purposes of the guidelines." Section 3D1.2 of the guidelines, labeled "Groups of Closely Related Counts," provides:

All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:

(a) When counts involve the same victim and the same act or transaction.

(b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objec-

tive or constituting part of a common scheme or plan.

(c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.

(d) When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

. . . .

Subsection (d) provides a list of thirty-four guidelines covering offenses that "are to be grouped" thereunder; the list includes sentencing guidelines sections 2F1.1 (fraud) and 2S1.1 (money laundering).[2]

Following Kneeland's presentence report ("PSR"), the district court grouped the conspiracy, mail fraud, and wire fraud counts (counts 1 through 4 and 6 through 34) and applied U.S.S.G. § 2F1.1. Pursuant to that guideline, the court added, to the base offense level of six, ten offense levels based on a total loss of more than $500,000. After applying section 2F1.1(b)(2) to add two more levels for more than minimal planning and a scheme to defraud more than one victim, a four-level role-in-the-offense enhancement pursuant to section 3B1.1(a), and a two-level enhancement for obstruction of justice under section 3C1.1, the court ultimately arrived at an adjusted offense level of 24. The court then combined into a second group counts 35 through 96, all of which involved money laundering offenses, and applied U.S.S.G. § 2S1.1. Beginning with a base offense level of 23, it added one offense level based on a value of funds laundered between $100,000 and $200,000. After applying a two-level enhancement for obstruction of justice, it calculated an adjusted offense level of 26. Finally, the court applied section 3D1.4 to calculate the combined offense level for the two groups of offenses, arriving at a total of

---

**2.** The subsection also provides a list of offenses "specifically excluded from the operation of this subsection." U.S.S.G. § 3D1.2(d).

28. Had the court combined the fraud and money laundering convictions into a single group, Kneeland contends, his total offense level would have been 26, rather than 28.

Kneeland argues that, although we have previously found that fraud and money laundering should not be grouped together, *see United States v. Lombardi,* 5 F.3d 568, 570 (1st Cir.1993), other circuits have held that grouping is appropriate where the money laundering and fraud schemes had the same victims, and the money laundering activities advanced the fraud scheme, *see United States v. Wilson,* 98 F.3d 281, 283 (7th Cir. 1996); *United States v. Leonard,* 61 F.3d 1181, 1186 (5th Cir.1995). He asserts that section 3D1.2(d) encompasses the fraud and money laundering counts here because, in his case, the victims of the money laundering counts were the same as the victims of the fraud counts and because the depositing of victims' funds in financial institutions, which gave rise to the money laundering counts, was, as in *Wilson,* incidental to the continuation of the advance fee scheme. To buttress this contention, Kneeland notes that he utilized the funds to pay for continued operations, site inspections, travel, and other costs involved in an ongoing, albeit fraudulent, loan brokerage operation.

■ As Kneeland explicitly argues only that subsection (d) of section 3D1.2 mandates grouping in his case, we limit our analysis to whether Kneeland's case meets the requirements of that subsection—an issue left open by our opinion in *Lombardi.*[3] We note that although Kneeland relies heavily on *Leonard,* 61 F.3d at 1185–86, to support his contention that subsection (d) governs his case, it is apparent that the Fifth Circuit in that case evaluated the defendant's counts under the criteria set forth in subsection (b) rather than those set forth in subsection (d). The *Leonard* panel found that the defendant's fraud and money laundering activities were part of the same continuing common criminal endeavor and that they involved the same victims. Although these determinations are

relevant to subsection (b), the court appeared to rely on subsection (d) to conclude that the offenses were properly grouped because the guidelines for both offenses were listed in that subsection. It did not, however, consider whether the counts actually fit within subsection (d)'s substantive requirements.

Section 3D1.2(d) applies, at least so far as is relevant here, in circumstances in which the offense level for a given set of counts "is determined largely on the basis of the total amount of harm or loss." Although we make no determination as to the scope of this subsection, we focus on the term "largely" to conclude that subsection (d) does not encompass Kneeland's fraud and money laundering convictions because the offense level for money laundering is generally not determined on the basis of total harm.

We do not dispute that the terms of U.S.S.G. § 2F1.1, the sentencing guideline covering fraud, indicates that fraud properly falls within the requirements for grouping set out in section 3D1.2(d). Fraud has a base offense level of only six, which by itself would give rise to a "Zone A" sentence, involving zero to six months' custody, *see* U.S.S.G. ch. 5, pt. A. That base level of six is subject to relatively large increases on the basis of the financial magnitude of the fraud ("the total amount of the harm or loss"). For example, one offense level is added to the base level if the loss is greater than $2,000, two levels are added if it is greater than $5,000, and so on, up to a maximum 18–level increase if the loss is greater than $80 million. *See* U.S.S.G. § 2F1.1(b)(1). Because the base offense level may be quadrupled on the basis of the total amount of loss, the offense level arguably is determined "largely" on the basis of total loss.

The guideline covering money laundering, U.S.S.G. § 2S1.1 is a different matter. Under that section, the base offense level for *any* money laundering is 23, a level that by itself would call for a sentence of 46 to 57

---

3. Although Kneeland in his brief quotes part of the language of subsection (d), and asserts that subsection (d) mandates grouping in his case, his supporting arguments—that his money laundering perpetuated and supported a continuing scheme and that the money laundering and fraud activities had the same victims—speak to a contention that the crimes should be grouped under subsection (*b*), not under subsection (d).

months' custody, *see* U.S.S.G. ch. 5, pt. A. That substantial base offense level is subject only to modest increases on the basis of amount laundered, at least until that amount becomes very large. Thus, there is no increase whatever if the laundered amount is no more than $100,000. *See* U.S.S.G. § 2S1.1(b)(2). If, as in Kneeland's case, the amount involved in the laundering activity is between $100,000 and $200,000, there is just a one-level increase. *See id.* This increase represents just five or six months' custody, or approximately ten percent of the sentence corresponding to the base offense level. Without making any determination as to whether there are situations in which the offense level for money laundering might be largely determined on the basis of total amount of harm or loss,[4] we are persuaded that, in this case at least, the offense level for money laundering was not based on aggregate harm and thus does not fall within the purview of subsection (d). Accordingly, we see no error in the district court's decision not to group the fraud and money laundering counts under section 3D1.2(d).

### 3. Enhancement for Role as Organizer

Kneeland next argues that the trial court erred in its guideline calculations by finding that his sentence for the fraud counts should be enhanced four levels for his alleged role as an organizer and leader in the offense. He asserts that, in fact, he was at most an equal partner in the fraud conspiracy with codefendant Brian Kelly, who received no such role-based increase.

 Reviewing the district court's determination "only for clear error or mistake of law," *see United States v. Talladino*, 38 F.3d 1255, 1261 (1st Cir.1994), we detect no reversible error. Sentencing guideline section 3B1.1(a) permits a four-level increase if "the Defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." The district court found that Kneeland's criminal activities met the requirements of the "otherwise extensive" prong of this sec-

tion and, accordingly, applied a four-level sentence enhancement. The record shows that it was Kneeland who formed Nippon, rented office space for its operations, and invited Kelly to join him in the fraudulent advance fee scheme. In addition, Kneeland directed the meetings with the victims of the scheme and explained the loan program to them. Kneeland held himself out as the president of Nippon and also represented that he controlled its board of directors. The district court's finding was thus amply supported.

 Even if we were to assume that Kelly's role in the advance fee scheme was commensurate with Kneeland's, this argument, without more, would not provide a basis for overturning the enhancement. We have held that "a perceived need to equalize sentencing outcomes for similarly situated codefendants, without more, will not permit a departure from a properly calculated guideline sentencing range." *United States v. Wogan*, 938 F.2d 1446, 1448 (1st Cir.1991); *see United States v. Romolo*, 937 F.2d 20, 25 n. 5 (1st Cir.1991); *United States v. Carr*, 932 F.2d 67, 72–73 (1st Cir.1991) (quoting *United States v. Joyner*, 924 F.2d 454, 460–61 (2d Cir.1991)). The logic that departures may not be employed to equalize similarly situated codefendants counsels that properly applied enhancements should not be avoided to achieve the same objective. *See* U.S.S.G. § 3B1.1, comment. (n.4) ("There can, of course, be more than one person who qualifies as a leader or organizer . . . .").

 Kneeland further asserts, however, that applying the enhancement for his role as organizer or leader in the offense, when combined with the enhancement for more than minimal planning under U.S.S.G. § 2F1.1(b)(2), amounts to impermissible "double counting" because the same factors were used as a basis for both enhancements. This argument is meritless. In 1993 the sentencing guidelines were amended to explicitly provide that, "[a]bsent an instruction to the contrary, the adjustments from different guideline sections are applied cumulative-

---

4. That money laundering may be properly grouped under subsection (d) in some situations is apparent from the fact that U.S.S.G. § 2S1.1 is included in the list of offenses, set forth in subsection (d), that may be grouped under the subsection.

ly (added together). For example, the adjustments from § 2F1.1(b)(2) (more than minimal planning) and § 3B1.1 (aggravating role) are applied cumulatively." U.S.S.G. § 1B1.1, comment. (n.4); *see, e.g., United States v. Cobleigh*, 75 F.3d 242, 251 (6th Cir.1996). It was not error for the district court to apply both enhancements.

*4. Sufficiency of the Evidence*

Finally, Kneeland argues that his convictions for money laundering under 18 U.S.C. § 1956(a)(1)(B)(i) should be reversed because there was insufficient evidence as a matter of law that he intended to conceal the funds deposited in and transferred among various financial institutions. He argues that because Thomas Zappala, the government auditor charged with tracing the funds, was not misled and, in fact, testified that the funds could have been traced through the various banks in a matter of minutes, no intent to conceal the funds may be attributed to him.

In reviewing the sufficiency of the evidence, we evaluate the evidence, including all reasonable inferences, in the light most favorable to the verdict. *See United States v. Isabel*, 945 F.2d 1193, 1201 (1st Cir.1991). To prove a violation of section 1956(a)(1)(B), the government was required to show that Kneeland engaged in financial transactions involving the proceeds of unlawful activity, knowing that the proceeds were from unlawful activity and that the transactions were designed "to conceal ... the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i); *see Isabel*, 945 F.2d at 1201.

After reviewing the record, we find that the government presented sufficient evidence at trial to establish Kneeland's guilt beyond a reasonable doubt on counts 64–88, the twenty-five counts of money laundering at issue. Kneeland transferred funds from the Nippon and Societe Kokusai accounts into two personal bank accounts in Massachusetts. From those accounts, he moved money to a bank in Los Angeles and to a brokerage account in Boston. He then transferred some of this money to a Chicago commodities brokerage firm and then back to one of his Massachusetts bank accounts. Eventually, he used some of the money to purchase a car. We reject Kneeland's argument that, because Zappala was not misled, Kneeland could not have had the requisite intent to conceal the funds. As the government rightly notes, Kneeland's argument ignores the context of Zappala's testimony. On cross examination, Kneeland (acting as his own attorney) asked Zappala how long it would take him to trace the flow of money through the various accounts *assuming* that he already had all the relevant transaction records and account information. Given that assumption, Zappala testified that tracing the money flow would take only minutes. On redirect examination, however, Zappala explained that doing the research necessary to find the relevant accounts and to compile the paper trail of information can take months. Such testimony, viewed in the light most favorable to the government, in combination with the evidence of Kneeland's numerous transfers of ill-gotten funds and his repeated use of cashier's checks, sufficed to support the jury's guilty verdicts on counts 64–88.

In sum, we reject all of Kneeland's arguments and *affirm* his convictions and his sentence.