USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT

No. 98-1742

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 IVETTE RIVERA-MALDONADO,

 Defendant, Appellant.

 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF PUERTO RICO

 [Hon. Hector M. Laffitte, U.S. District Judge]

 

 Before

 Torruella, Chief Judge,

 Coffin and Cyr, Senior Circuit Judges.

 

 Lydia Lizarribar-Masini for appellant.
 Warren V zquez, Assistant United States Attorney, with whom
Guillermo Gil, United States Attorney, and Nelson Prez-Sosa, Assistant
United States Attorney, were on brief for appellee.

 

 October 19, 1999
 CYR, Senior Circuit Judge. Ivette Rivera-Maldonado
appeals the life sentence imposed upon her for conspiring to
distribute cocaine and marijuana, and aiding and abetting the use
of minors in distributing controlled substances, in violation of 21
U.S.C. 841(a)(1). We remand for resentencing.
 I
 BACKGROUND
 During a five and one-half month period in early 1995, an
investigation into suspected drug distribution was conducted within
the Los Laureles Housing Project ("project") in Bayamon, Puerto
Rico, by the Special Investigations Bureau of the Puerto Rico
Department of Justice and the United States Drug Enforcement Agency
("DEA"). Various investigators thereafter testified at trial that
Maldonado had supervised a drug-distribution ring operated from her
apartment in the project. Although she was never observed selling
drugs, the evidence established that she used others, including
minors, to sell crack and powder cocaine as well as marijuana.
 The government introduced 26 surveillance videotapes
depicting various drug distribution activities. Agent Cesar
Martinez, who had observed numerous transactions, estimated that
from 20 to 25 drug sales occurred per hour. Agent Victor Manuel
Ayala-Rivera testified as an expert witness that in his experience
drug distribution operations in the project normally operated three
shifts daily. On that basis he opined that the Maldonado
organization would have distributed more than 24 kilograms of
controlled substances during the five and one-half month period
spanned by the DEA investigation.
 At sentencing, after determining that Maldonado should be
held responsible for distributing controlled substances totaling 24
kilograms, the district court set the base offense level ("BOL") at
38. It then imposed a four-level role-in-the-offense enhancement
and a two-level enhancement for employing minors, which resulted in
the maximum adjusted base offense level of 43 and triggered the
mandatory life-imprisonment sentence now challenged on appeal. See
U.S.S.G. Sentencing Table, comment 2.
 II
 DISCUSSION
A. The Drug-Quantity Calculations
 Under U.S.S.G. 2D1.1(c), the BOL depends in large part
upon the total drug quantities involved in the offense. Insofar as
the quantities seized underrepresent the demonstrated scale of a
drug-distribution conspiracy, however, the sentencing court is to
"approximate the [total] quantit[ies]." U.S.S.G. 2D1.1, comment.
(n.12). The government must establish these drug quantities by a
preponderance of the evidence. United States v. Whiting, 28 F.3d
1296, 1304 (1st Cir. 1994). Since Maldonado stands convicted of
conspiring to distribute controlled substances, she is responsible
for all "drugs [she] personally handled or anticipated handling,
and, under the relevant conduct rubric, for drugs involved in
additional acts that were reasonably foreseeable by [her] and were
committed in furtherance of the conspiracy." United States v.
Sepulveda, 15 F.3d 1161, 1197 (1st Cir. 1993).
 Maldonado first contends that the ultimate drug-quantity
finding made by the district court must be set aside because it is
based on speculative estimates derived from unreliable evidence and
improper extrapolations. Since the instant offenses involved
various controlled substances, the sentencing court was required to
"determine both the amount and the kind of 'controlled substances'
for which [the] defendant should be held accountable and . . .
impose a sentence that varie[d] depending upon amount and kind." 
Edwards v. United States, 118 S. Ct. 1475, 1477 (1998). A
reasonably reliable differentiation among the various types of
controlled substances is particularly important in these cases,
since much more severe sentencing ranges are prescribed in crack-
cocaine distribution offenses for which the applicable offense
levels, see U.S.S.G. 2D1.1(c)(8)-(14), may increase with each
additional gram. See Sepulveda, 15 F.3d at 1198.
 Although the sentencing court may rely on reasonable
estimates and averages in arriving at its drug-quantity
determinations, their probable accuracy must be founded on adequate
indicia of reliability, United States v. Webster, 54 F.3d 1, 5 (1st
Cir. 1995), and demonstrable record support, see, e.g., United
States v. Marrero-Ortiz, 160 F.3d 768, 780 (1st Cir. 1998)
("[Absent] particularized findings to support the assigned BOL, we
have no principled choice but to vacate the sentence and remand for
further findings and resentencing."); United States v. Welch, 15
F.3d 1202, 1215 (1st Cir. 1993); Sepulveda, 15 F.3d at 1198. Nor
may a criminal sentence be predicated simply upon conclusory
prosecutorial assessments that the extensiveness of the conspiracy
suggested a "substantial amount of narcotics business." See
Marrero-Ortiz, 160 F.3d at 779-80 ("[W]e cannot uphold a drug
quantity calculation on the basis of hunch or intuition."); United
States v. Miele, 989 F.2d 659, 668 (3d Cir. 1993) ("[A]
determination that [the] drug activity was substantial does not
translate readily into a specific drug quantity finding, which is
the ultimate issue for sentencing purposes.").
 1. The Drug-Quantity Calculation
 The district court purportedly arrived at its BOL 38
determination by adopting the drug-quantity calculations set out in
Maldonado's objections to the Presentence Report ("PSR"). The
record plainly reflects, however, that in so doing the district
court utilized incorrect metric conversions. See supra note 4. 
That is, as a unit of mass/weight, one gram equals 1,000
milligrams, rather than one milligram, see U.S.S.G. 2D1.1,
comment. (n.10) (Measurement Conversion Table), and one kilogram
equals 1,000,000 milligrams, not 100,000 milligrams, id. 
Accordingly, based on the proper metric conversions the BOL should
have been 24 rather than 38.
 Although the district court stated that its BOL 38
determination was supported by the testimony of DEA Agent Rivera,
we can discern no record support for its assertion. Instead, Agent
Rivera testified that a drug point at the Los Laureles project
would "average . . . between 150 and 180 grams" of controlled
substances per day, the bulk of which would be cocaine. Moreover,
shortly thereafter the district court asserted that it was relying
on Maldonado's objections to the PSR in setting the BOL. See supra
note 4. Finally, although the PSR opined that "[t]he investigation
established" that Maldonado's drug trafficking organization "had
the capability to distribute more than five (5) kilograms of
cocaine base (crack)," and that "the amounts of narcotics
distributed during the period of the conspiracy was [sic]
approximately 24 kilograms[,]" the PSR neither breaks down the 24
kilograms by drug type, nor indicates how it was calculated.
 2. The Drug-Quantity Evidence at Trial
 At trial, after viewing the drug transactions depicted on
a two-hour composite videotape, Agent Martinez estimated that
approximately 20 to 25 transactions occurred hourly at the
Maldonado drug point. Agent Martinez acknowledged, however, that
this composite videotape formed the sole foundation for his drug-
quantity estimate because it disclosed a lot of drug activity. Nor
was Agent Martinez able to identify which individual surveillance
videos among the 26 admitted at trial comprised the foundation
for the composite videotape upon which the drug-quantity estimate
was based. Finally, he acknowledged that he had never estimated
the number of drug transactions which would have occurred during a
slow period.
 The record on appeal contains no other discernible
documentary or testimonial evidence upon which to predicate a
reasonably reliable determination that the two-hour period captured
on the composite videotape utilized at trial by Agent Martinez was
reasonably representative, either as to the volume or the variety
of drug sales at the Maldonado drug point during the six-month
indictment period. Nor did the district court articulate detailed
findings which would enable us to determine whether its drug-
quantity determinations were reasonably reliable notwithstanding
its erroneous metric conversions. See supra Section II.A.1. For
instance, it neither mentioned Agent Martinez nor his trial
testimony, even though 26 surveillance videos were admitted in
evidence through Agent Martinez as he described what each depicted.
 Moreover, for the most part Martinez simply stated that
the videotaped transactions involved "controlled substances,"
without identifying the drug type. The surveillance videos
themselves depicted three controlled marijuana sales and one powder
cocaine sale to informants, without any indication of the
respective drug quantities involved in those transactions. In
addition, Agent Martinez testified that he had witnessed two
marijuana sales, without mentioning any other relevant particulars. 
Finally, he estimated the aggregate daily drug volume at "about
150, 180 grams," without apportioning it among the three controlled
substances sold at the Maldonado drug point.
 Nor do the respective drug-type quantities involved in
the twelve controlled buys marijuana (3) (9.9 grams); crack
cocaine (4) (3.8 grams); powder cocaine (5) (3.05 grams) afford
sufficient support for apportioning the aggregate drug-quantity
estimate among the three illegal drugs sold at the Maldonado drug
point. The Second Circuit recently exposed the flawed assumptions
implicit in similar extrapolations:
 [A] forensic chemist had selected at random
 four of the 103 balloons passed by Shonubi
 after his arrest, determined the average
 weight of the heroin contained in these four
 balloons, and then multiplied that average
 weight by 103 to conclude that the weight of
 the heroin contained in all 103 balloons was
 427.4 grams. This approach rested on the
 assumption that the four balloons selected
 were representative of the entire 103
 balloons, an assumption that, in turn, rested
 on subsidiary assumptions that each of the 103
 balloons contained heroin, that the average
 quantity of heroin in each of the four
 balloons selected was the same as the average
 quantity in all of the 103 balloons, and that
 the average purity of the heroin in the four
 balloons selected was the same as the purity
 of the heroin in all of the 103 balloons
 because all the heroin came from the same
 batch of heroin.

United States v. Shonubi, 103 F.3d 1085, 1092 (2d Cir. 1997).
 Generally speaking, the smaller the sampling, the less
reliable the resulting probability estimate. See David H. Kaye &
David A. Freedman, Reference Guide On Statistics, in Reference
Manual on Scientific Evidence 351, 378-82 (Federal Judicial Center,
1994). The present sampling Ä i.e., twelve controlled buys drawn
from a set of 86,400 transactions (20 transactions per hour, times
24 hours per day, times 180 days) Ä is minuscule. The core risk
entailed in relying on such tiny samplings is that "the smaller the
sample size, the greater the likelihood that the [evidence]
reflects chance." See Stendebach v. CPC Int'l, Inc., 691 F.2d 735,
738 (5th Cir. 1982) (citation omitted); see also International Bhd.
of Teamsters v. United States, 431 U.S. 324, 340 (1977)
("Considerations such as small sample size may, of course, detract
from the value of such evidence."); Parker v. Federal Nat'l
Mortgage Ass'n, 741 F.2d 975, 980 (7th Cir. 1984) (finding that
small sample size causes "[a] small change in the underlying raw
data . . . [to] result in dramatic statistical fluctuations"). In
other contexts courts have counseled against, or rejected,
similarly small samplings. See, e.g., Mayor of Philadelphia v.
Educational Equal. League, 415 U.S. 605, 621 (1974) (noting that
trial court's concern over sample size of 13 was "well founded");
LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 849 (1st Cir. 1993)
(observing that sample size of 5 "carries little or no probative
force"); Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 511 (4th
Cir. 1994) (holding that sample size of 4 has no probative value);
Shutt v. Sandoz Crop Protection Corp., 944 F.2d 1431, 1433-34 (9th
Cir. 1991) (holding that group of 11 was too small); Lucas v. Dover
Corp., 857 F.2d 1397, 1403 (10th Cir. 1988) (warning that sample
size of 18 "must be evaluated with caution"); Simpson v.
Midland-Ross Corp., 823 F.2d 937, 943 (6th Cir. 1987) (considering
sample size of 17 "suspect"); Palmer v. United States, 794 F.2d
534, 539 (9th Cir. 1986) (finding "sample size [of 15] too small to
have predictive value").
 Furthermore, the inferential leap in the instant case is
founded on the bare assumption Ä unsubstantiated, if not directly
undermined, by record testimony, see, e.g., supra note 7 Ä that the
quantities involved in the crack cocaine sales made to Maldonado's
customers closely resembled those in the controlled buys arranged
by government agents. Although we do not suggest that the
respective drug-type quantities indicated in these controlled buys
must be disregarded merely because they were controlled by the
government, we do say that the necessary factual inference that
these controlled buys were reasonably representative of the
uncontrolled drug transactions at the Maldonado drug point should
find discernible record support. See Whiting, 28 F.3d at 1304.
 As the burden is on the government to establish drug
quantities, see United States v. Barnett, 989 F.2d 546, 553 (1st
Cir. 1993), normally "[w]e must determine whether [it] presented
sufficient reliable information to permit the court reasonably to
conclude that appellants were responsible for a quantity of drugs
at least equal to the quantity threshold for the assigned base
offense level." Id. In the instant case, however, the record on
appeal neither enables us to uphold the drug-type apportionment
methodology articulated by the district court, nor to discern one
which would.
 For example, the trial testimony given by Agent Ayala was
equivocal as concerns any quantitative apportionment among the
three controlled substances dispensed at the Maldonado drug point. 
Ayala testified that in places like the Los Laureles Housing
Project, a drug point "works like around three shifts, you know. 
Depending on the area its going to be four shifts, two shifts, but
this one works almost to midnight . . . . [T]he average sold there
is between 150 and 180 grams or a little bit more . . . [a]nd the
gross amount sold here in this place is cocaine. Marijuana is sold
there. Crack is sold there and cocaine, but--crack is cocaine." 
Moreover, Ayala's approximations regarding the number of shifts and
the quantities sold daily were not based on observations of the
Maldonado drug point. More importantly, Ayala cast no light upon
the respective drug quantities crack cocaine, powder cocaine, or
marijuana included in the 150-to-180-gram daily sales volume
estimate.
 The potential for grave error where one conclusory
estimate serves as the multiplier for another, (i.e., average drug
quantity per transaction multiplied by average number of
transactions per hour and average operating hours per day) may
undermine the reasonable reliability essential to a fair sentencing
system. See Sepulveda, 15 F.3d at 1198 ("[T]he two flawed findings
feed on each other; by using not one, but two, unsupported averages
to arrive at both the number of trips undertaken and the amounts of
cocaine handled in the course of each trip, the court compounded
the error of its ways."). In the instant case the risk of error
was compounded by pyramiding unreliable inferences: the drug-
quantity estimate per sale was based on eleven controlled buys
throughout the entire six-month investigation; the number of
transactions per day on an unquantified number of observations; and
the average number of shifts per day without any 24-hour-day
observation of the drug point.
 Most importantly, particularly in cases like the present
where "drug quantity has a dramatic leveraging effect," Sepulveda,
15 F.3d at 1198, special care must be taken to ensure that
particularized drug-type quantity findings are predicated on
reliable information and, where significant uncertainty exists,
that those findings err on the side of caution, see United States
v. Eke, 117 F.3d 19, 24 (1st Cir. 1997); United States v. Sklar,
920 F.2d 107, 113 (1st Cir. 1990). Yet there is no discernible
quantitative breakdown among the three controlled substances
dispensed at the Maldonado drug point, though crack cocaine
directly impacts the BOL determination far more dramatically than
do much larger amounts of powder cocaine or marijuana.
 Absent adequately particularized findings or discernible
record support for the BOL 38 assigned by the district court, see
Webster, 54 F.3d at 5, and given the mistaken metric conversions
assertedly relied upon by the district court, the sentence must be
vacated and the case remanded for resentencing. See, e.g.,
Marrero-Ortiz, 160 F.3d at 780 ("[Without] particularized findings
to support the assigned BOL, we have no principled choice but to
vacate the sentence and remand for further findings and
resentencing."); see also Sepulveda, 15 F.3d at 1198; United States
v. Butler, 41 F.3d 1435, 1447-48 (11th Cir. 1995) (remanding
because sentencing court failed to articulate "a reliable method of
quantifying the amount of drugs attributable to each appellant");
United States v. Carreon, 11 F.3d 1225, 1231 (5th Cir. 1994)
(remanding for findings where appellate court is "left to second-
guess the basis for the district court's calculation"); United
States v. Shonubi, 998 F.2d 84, 89-90 (2d Cir. 1993) (vacating, in
the absence of other evidentiary support, a drug-quantity finding
arrived at by rote multiplication of number of trips times quantity
carried on one trip); United States v. Garcia, 994 F.2d 1499, 1509
(10th Cir. 1993) (vacating sentence and holding that averages
utilized to arrive at drug-quantity findings must be "more than a
guess"); United States v. Hewitt, 942 F.2d 1270, 1274 (8th Cir.
1991) (condemning use of "far reaching" averaging assumptions in
estimating drug quantity). On remand, the district court is free
to consider such additional evidence as it deems appropriate.
B. The Role-in-Offense Enhancement

 The four-level role-in-offense enhancement is authorized
under U.S.S.G. 3B1.1(a) for a defendant who acted as an organizer
or leader of a criminal activity involving five or more
participants who were "'criminally responsible for the commission
of the offense.'" United States v. Preakos, 907 F.2d 7, 10 (1st
Cir. 1990) (quoting U.S.S.G. 3B1.1, comment. (n.1)). Moreover,
"barring a mistake of law[,] . . . 'battles over a defendant's
status . . . will almost always be won or lost in the district
court.'" United States v. Conley, 156 F.3d 78, 85 (1st Cir. 1998)
(quoting United States v. Graciani, 61 F.3d 70, 75 (1st Cir.
1995)). See United States v. Rodriguez, 63 F.3d 1159, 1168 (1st
Cir. 1995) ("The district court's finding, made with the benefit of
all of its observations at trial, is entitled to, and is given
here, considerable deference.").
 The evidence before the district court plainly
demonstrated that there were eight criminally responsible
participants in addition to Maldonado. Furthermore, the contention
that minors should not be considered "participants" under U.S.S.G.
 3B1.1 is utterly without merit. See, e.g., United States v.
Cruz, 120 F.3d 1, 4 (1st Cir. 1997) (defendant's "14-year-old
paramour" qualified as "participant" under 3B1.1(a)), cert.
denied, 118 S. Ct. 729 (1998); United States v. Clay, 117 F.3d 317,
321 (6th Cir.), cert. denied, 118 S Ct. 395 (1997). Accordingly,
the four-level enhancement imposed under U.S.S.G. 3B1.1(a) was
proper.
C. The Enhancement for Utilizing Minors

 Next, Maldonado contends that the district court engaged
in impermissible "double counting" by invoking section 2D1.2(a)(1),
since the minors involved in the conspiracy already had been
counted under section 3B1.1(a), that is, among the five
participants supervised by Maldonado. Section 2D1.2 prescribes
a two-level enhancement in "the offense level . . . applicable to
the quantity of controlled substances directly involving[, inter
alia,] . . . an underage . . . individual." U.S.S.G. 2D1.2(a)(1)
(emphasis added).
 Absent controlling authority we look to the analogous
case law on "double counting," which holds that Sentencing
Guidelines enhancement provisions apply cumulatively. In United
States v. Kneeland, 148 F.3d 6, 16-17 (1st Cir. 1998), we held that
a section 3B1.1(a) role-in-offense enhancement, combined with an
enhancement for more than minimal planning under section
2F1.1(b)(2), did not constitute impermissible "double counting,"
even though the defendant's involvement as an organizer and planner
formed the basis for both enhancements. We noted that the
commentary on role-in-offense enhancements expressly endorses
"double counting" under U.S.S.G. 3B1.1 and other guideline
sections. Id. Similarly, in Clay, 117 F.3d at 320-21, the Sixth
Circuit affirmed cumulative enhancements under sections 2D1.2(a)(1)
and 3B1.1(c) (two-level enhancement requiring two or more
participants), despite the fact that the same "juvenile" was
considered under both provisions.
 Similarly, sentencing guidelines policy supports
cumulative applications under sections 2D1.2(a)(1) and 3B1.1(a): 
"The offense level adjustments from more than one specific offense
characteristic within an offense guideline are cumulative (added
together) . . . . Absent an instruction to the contrary, the
adjustments from different guideline sections are applied
cumulatively (added together)." U.S.S.G. 1B1.1, comment. (n.4)
(emphasis added). Finally, nothing in their text or commentary
suggests that either section 2D1.1(a)(1) or section 3B1.1(a) may
not be applied cumulatively. Nor does Maldonado cite authority to
the contrary.
 Since Maldonado organized the drug distribution scheme
and utilized minors in furthering it, the cumulative application of
sections 2D1.1(a)(1) and 3B1.1(a) by the district court fairly
reflected both the seriousness of her offense and the likelihood of
recidivism. See United States v. Ortiz, 64 F.3d 18, 21 (1st Cir.
1995).
D. Denial of Downward Departure

 In determining whether an aggravating or mitigating
circumstance permits a departure under U.S.S.G. 5K2.0, sentencing
courts must ascertain "[w]hat features of th[e] case, potentially,
take it outside the Guidelines' 'heartland' and make of it a
special, or unusual, case[.]" Koon v. United States, 518 U.S. 81,
95 (1996) (quoting United States v. Rivera, 994 F.2d 942, 949 (1st
Cir. 1993) (Breyer, C.J.)). Thus, in the present case the district
court was required to determine whether the Sentencing Commission
adequately considered the impact the sentencing guidelines would
have on a criminal defendant who is HIV positive and whose
dependent child has AIDS.
 The district court appropriately recognized that it
lacked the authority to depart downward, given the record evidence
that Maldonado's medical and physical condition did not enable a
finding that she had an "extraordinary physical impairment."
U.S.S.G. 5H1.4. First, although Maldonado was HIV positive, she
did not have advanced AIDS. See United States v. Thomas, 49 F.3d
253, 261 (6th Cir. 1995) ("Thomas would only be entitled to a
departure if his HIV had progressed into advanced AIDS, and then
only if his health was such that it could be termed an
'extraordinary physical impairment.'"). Second, like the
defendant in Thomas, id., Maldonado remains in relatively good
physical condition. As the district court observed at sentencing,
the Bureau of Prisons determined that Maldonado had no difficulty
with either her emotional or physical health. Moreover, the court
noted that Maldonado appeared to be in "much better physical
condition . . . than she was . . . about four, six months ago when
she was [originally] sentenced."
 A "[p]hysical condition . . . is not ordinarily relevant
in determining whether a sentence should be outside the applicable 
guideline range." U.S.S.G. 5H1.4. Nor, to our knowledge, has
asymptomatic AIDS been considered a sufficient basis for a downward
departure under section 5H1.4. See United States v. Woody, 55 F.3d
1257, 1275-76 (7th Cir. 1995); Thomas, 49 F.3d at 261.
 Further, Maldonado contends that she should have been
granted a downward departure because her dependent son has AIDS and
requires her care. The district court correctly observed that it
has the "power to depart in 'unusual cases' and where family
circumstances are out of the 'ordinary,'" United States v. Rivera,
994 F.2d 942, 953 (1st Cir. 1993), such as the need to care for sick
children, see id. at 952-53 (noting that defendant was the only
caregiver for three small children); see also United States v.
Gaskill, 991 F.2d 82, 85-86 (3d Cir. 1993) (observing that
defendant's responsibilities for mentally ill wife might warrant
departure); United States v. Johnson, 964 F.2d 124, 128-30 (2d Cir.
1992) (remarking that defendant had sole responsibility for raising
four children); United States v. Alba, 933 F.2d 1117, 1122 (2d Cir.
1991) (noting that defendant was raising two children, and caring
for live-in handicapped father and grandmother); United States v.
Pena, 930 F.2d 1486, 1494-95 (10th Cir. 1991) (considering that
defendant was single parent of infant and sole supporter of
sixteen-year-old daughter and daughter's infant). Nevertheless, as
with other grounds for departure, sentencing courts may depart on
the basis of family hardship only in exceptional cases. See
U.S.S.G. 5H1.6 ("Family ties and responsibilities and community
ties are not ordinarily relevant in determining whether a sentence
should be outside the applicable guideline range."). Thus,
"[d]isruption of the defendant's life, and the concomitant
difficulties for those who depend on the defendant, are inherent in
the punishment of incarceration." Johnson, 964 F.2d at 128. In
any event, since the district court fully recognized its authority
to depart, but chose not to do so in these circumstances, we lack
appellate jurisdiction over the present claim. See Rivera, 994
F.2d at 953.
E. Alleged Sentencing Disparities
 Maldonado claims that a downward departure was warranted
due to the "extreme disparity" between her sentence and those meted
out to codefendants. The district court determined instead that
Maldonado and her codefendants who were sentenced to 120 months
 were not "similarly situated," in that Maldonado was both the
organizer and leader of the drug operation, whereas the
codefendants performed distinctly subordinate roles. We must
accord the district court finding "considerable deference." See
Rodriguez, 63 F.3d at 1168.
 Since Maldonado was far more culpable than her
codefendants, see, e.g., United States v. Trinidad de la Rosa, 916
F.2d 27, 30-31 (1st Cir. 1990) (holding that disparate sentences
were warranted, due in part to the levels of active involvement of
various defendants); see also United States v. Carr, 932 F.2d 67,
73 (1st Cir. 1991); United States v. Goddard, 929 F.2d 546, 550
(10th Cir. 1991), we must reject her claim.
F. Admission of Composite Videotapes
 
 Finally, at trial, over Maldonado's objection, the
district court admitted composite videotapes and permitted Agent
Fonseca to testify to the events depicted. Although he had not
observed the drug transactions, Fonseca testified to having
reviewed each crime-scene videotape with Agent Martinez, who had
videotaped the crime scenes. Later, Fonseca prepared the composite
videos summarizing the daily videos previously admitted in
evidence. See United States v. Sawyer, 85 F.3d 713, 740 (1st Cir.
1996). Agent Martinez in turn testified that each daily video
accurately reflected what he had observed as it was being taped. 
Finally, Maldonado was afforded an opportunity to challenge Agent
Fonseca's testimony on cross-examination and place the composite
videotapes in their proper context. Cf. United States v. Nivica,
887 F.2d 1110, 1125 (1st Cir. 1989) (noting that defendant's
assertion that summaries failed to reflect "total financial
activity" "affect[s] the weight rather than the admissibility of
the government's summaries"). There was no abuse of discretion.
 III
 CONCLUSION
 For the foregoing reasons, we affirm the judgment of
conviction, vacate the life imprisonment sentence, and remand to
the district court for resentencing consistent with this opinion.
 SO ORDERED.