191 F.3d 61 (1st Cir. 1999)
 UNITED STATES, APPELLEE,
v.
RICHARD N. LABARE, DEFENDANT, APPELLANT.
 No. 98-1897
 U.S. Court of Appeals, First Circuit
 September 08, 1999
 
 APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. Gene Carter, U.S. District Judge]
 Jane Elizabeth Lee for appellant.
 Margaret D. McGaughey, Assistant United States Attorney, with whom Jay P. McCloskey, United States Attorney, was on brief for appellee.
 Before Selya, Circuit Judge, Cyr, Senior Circuit Judge, and Boudin, Circuit Judge.
 Boudin, Circuit Judge.
 
 
 1
 On February 8, 1997, a taxi driver named Merritt Warren was robbed of $1,800 in cash and shot multiple times while in a parking lot in Portland, Maine. The police arrested Richard LaBare on an unrelated matter on February 27, 1997. Immediately thereafter, based on evidence described below, the state brought charges against LaBare for attempted murder and robbery in the Warren case, and the federal government filed a criminal complaint alleging a felon-in-possession violation in connection with the same event. 18 U.S.C. § 922(g). Counsel was appointed that same day, and LaBare was placed in the Kennebec County Jail in Augusta, Maine, pending trial on the state and federal charges.
 
 
 2
 While in the jail, LaBare shared a cell block with several other prisoners, including Joseph Chaloux and Arthur Mollo. Chaloux had been sentenced to six months imprisonment on a state burglary conviction, and Mollo was then awaiting trial on a felon-in-possession charge. Over a period of weeks, LaBare allegedly made inculpatory statements to both Mollo and Chaloux about the Warren shooting. As Mollo and Chaloux later testified, LaBare gave them detailed, if conflicting, accounts of what happened on February 8, 1997, and solicited their help to prevent LaBare's girlfriend and Warren from testifying against LaBare (through bribery, threats of physical harm, or harm itself).
 
 
 3
 Aided in part by Chaloux's testimony against LaBare, a federal grand jury returned a one-count indictment on March 25, 1997, charging LaBare with being a felon in possession of ammunition. 18 U.S.C. § 922(g). Thereafter, LaBare moved to suppress the testimony of Mollo and Chaloux, and a hearing on the motion was held before a magistrate Judge on September 4-5, 1997. LaBare argued that Mollo and Chaloux acted as agents of the government, that they "deliberately elicited" information from LaBare about the crime with which he had been charged, that these interrogations occurred outside the presence of LaBare's counsel, and that they therefore violated his Sixth Amendment right to counsel's assistance.
 
 
 4
 After hearing testimony from another prisoner offered by LaBare and testimony from Mollo, Chaloux, and several government agents who had interviewed them, the magistrate Judge recommended that the motion to suppress be denied. The district court largely upheld the magistrate Judge save that the district court suppressed statements made by LaBare to Chaloux after March 11, 1997; the court found that at a March 11 meeting with the government Chaloux had been instructed as to how to glean information from LaBare about the Warren shooting, and that Chaloux's follow-up questions to LaBare (even though contrary to instructions) amounted to forbidden interrogation.
 
 
 5
 LaBare was tried by a jury on the federal charge in December 1997. The government's case included testimony from Lorie Fournier, who had been LaBare's girlfriend at the time of the Warren shooting. She testified, among other things, that on the evening of the crime she and LaBare had been staying at a motel not far from the crime scene; she also stated that when LaBare left the room that evening he said he was going to find a friend who owed him money; and, earlier that day, Fournier saw that LaBare was carrying a gun in his pants. Warren testified at trial that LaBare was the man who had shot him.
 
 
 6
 The government also offered testimony from two friends of LaBare's, Gene and Norma Wood. Norma testified that after the crime LaBare told her he shot the taxi driver because he needed money. Norma's husband, Gene Wood, testified that LaBare had told him he had a hat with a ponytail sewn in it; such a hat was found in the car police recovered near the scene. Gene Wood also testified that LaBare told him of a plan to blackmail the cab driver into not testifying against him. Both Woods testified that LaBare repeatedly asked them to provide a false alibi for him for the evening of the Warren shooting.
 
 
 7
 Joseph Chaloux testified that in conversations with LaBare prior to March 11, 1997, LaBare told him that he was involved with a shooting of a cab driver in Portland, and LaBare asked Chaloux if he would accept $10,000 from LaBare to kill the cab driver. LaBare further stated that if he failed to find someone willing to kill the driver, he would try to bribe the driver not to testify against him. Mollo testified that LaBare had offered him money to get friends in a motorcycle gang to break Fournier's legs as a warning not to testify, and LaBare further told Mollo how he had stood over the cab driver and fired at him as Warren pleaded for his life.
 
 
 8
 The government also offered circumstantial evidence. Notably, Warren testified that the getaway car bore a temporary license plate containing the number "2"; a Subaru purchased by LaBare for Fournier was found a mile or so from the shooting with just such a license plate. Also, the police found several spent small-caliber weapon shell casings in or near the taxi, and agents recovered from LaBare and Fournier's home a magazine for a weapon of the same caliber. According to Chaloux's testimony, LaBare said that he had used a small-caliber weapon to shoot a cab driver in Portland.
 
 
 9
 In LaBare's favor, Lorie Fournier admitted that she was a manic depressive and had been in a bad state at the motel. Warren conceded that he had picked out two men from police photographs after he was shot and, though one was LaBare, Warren had said that the other was more likely the shooter. Chaloux and Mollo, of course, had criminal records and, being incarcerated, had an obvious self-interest in pleasing the prosecutors. And while the LaBare-Fournier car was found a mile away from the robbery, Warren said that the car he saw at the scene was a different color.
 
 
 10
 LaBare did not testify at trial but offered two witnesses in addition to the impeachment evidence already set forth. One, his prison mate Cavallaro, said he had never heard LaBare admit to the shooting or threaten Fournier. And Kenneth Meader, another prisoner, said that Chaloux had told him that Chaloux knew of a way to beat the system (the possible implication being that Chaloux might lie to get out of jail). Although the court then refused to allow Meader to expand upon this point, Meader's initial statement was never struck from the record.
 
 
 11
 The jury deliberated for about four hours and then found LaBare guilty of the felon-in-possession offense. Thereafter, based on computations described below, the district court sentenced LaBare to 327 months in prison. After the federal trial but before sentencing, LaBare was convicted in state court for robbery and attempted murder for the Warren shooting and sentenced to 40 years in state prison. At the federal sentencing, the district Judge rejected LaBare's request that the federal sentence be made expressly concurrent with the state sentence. LaBare now appeals from both his conviction and his sentence.
 
 
 12
 LaBare's challenge to his conviction rests on a single claim: that the testimony of Mollo and Chaloux should have been suppressed in its entirety because it was obtained in violation of LaBare's right to counsel. The basis for this claim is a line of cases beginning with Massiah v. United States, 377 U.S. 201 (1964), holding that once a criminal proceeding has been initiated and a defendant's right to counsel has attached, the government may not "deliberately elicit" statements from the defendant, in the absence of counsel and without a proper waiver.[1] And, with limited exceptions, e.g., Michigan v. Harvey, 494 U.S. 344 (1990) (use for impeachment allowed), the government may not introduce against the defendant incriminating statements procured in violation of Massiah. See Michigan v. Jackson, 475 U.S. 625, 629-30 (1980).
 
 
 13
 The Supreme Court has made clear that for Massiah purposes the right to counsel attaches when "adversary judicial criminal proceedings" have commenced against an accused, "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." United States v. Gouveia, 467 U.S. 180, 188 (1984) (quoting Kirby v. Illinois, 406 U.S. 682, 688-89 (1972)). In this case, adversary proceedings against LaBare began no later than February 28, 1997, when the federal criminal complaint was filed against him for the felon-in-possession charge ancillary to the Warren crime. The jailhouse conversations with which we are concerned all occurred after that date.
 
 
 14
 The government assumes that the right to counsel attached but argues that neither Mollo nor Chaloux were acting as the government's agents in any interrogation of LaBare; and, says the government, neither prisoner actively elicited information from LaBare. Massiah applies only to interrogation by the government or someone acting on its behalf, Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986); even a government agent can testify as to what the defendant said to him so long as the agent did not actively elicit the information. Id. But while these legal premises are clear, their application to this case is less than straightforward.
 
 
 15
 Mollo's testimony presents the greater difficulty for the government. Mollo, being held on a federal charge in Kennebec County Jail, was interviewed on February 28, 1997, by federal authorities to arrange for Mollo's general cooperation. In this Discussion, the Assistant U.S. Attorney told Mollo that he was not to question other inmates but only to report what they volunteered; and Mollo was also advised that he was not a government agent. Mollo says that at this time he did not know LaBare; and LaBare's name was not mentioned in the interview. On March 11, Mollo entered a plea agreement with the government, promising to disclose "all that he knows or has heard about violations of federal and state law."
 
 
 16
 Mollo apparently met LaBare after Mollo's transfer to the latter's cellblock in March 1997; during the next several weeks or so, LaBare (according to Mollo) made a number of statements incriminating LaBare in the Warren robbery and shooting. On March 31, Mollo wrote to the Assistant U.S. Attorney to say that he had information about LaBare; he was interviewed on April 11, making the first of several reports about what LaBare had said or was continuing to say. Ultimately, Mollo testified at LaBare's trial as to LaBare's admissions relating to the crime and also LaBare's attempts to procure help in silencing witnesses against him.
 
 
 17
 The magistrate Judge found that all of the statements made by LaBare to Mollo occurred before Mollo's meeting with the Assistant U.S. Attorney on April 11, that prior to this point the government had never directed Mollo to focus upon LaBare in any way, and that no evidence showed that the government had deliberately placed Mollo in proximity to LaBare. The magistrate Judge also suggested that whatever encouragement Mollo had given to LaBare to discuss his case did not amount to interrogation. The district Judge sustained the magistrate Judge's recommendation as to Mollo without separate Discussion, and LaBare now claims this to be error.
 
 
 18
 From February 28, 1997, onward, the government encouraged Mollo to collect information volunteered by inmates, but not until April 11, 1997, did the government focus Mollo's attention on LaBare; by then Mollo had already collected the information he provided at trial. At least two circuits have regarded this lack of governmental focus on the defendant as precluding a successful Massiah objection to information collected by the prisoner-witness on his own; two other circuits, by contrast, treat the lack of focus on the defendant merely as one element in the Massiah equation.[2] The division in the circuits is not surprising, for Massiah was never a precise formula and later Supreme Court rulings waver in their emphases.
 
 
 19
 On strict agency principles, it could be argued that Mollo became a government "agent" on February 28, 1997, when he agreed to report on the future crime-related statements of fellow prisoners and accepted direction as to how to perform this task (e.g., "don't ask questions"), since an agent is one who acts for another by agreement and whose work is subject to control by the principal. Restatement (Second) of Agency §§ 1, 14 (1958). And under traditional agency rules, it might not matter that the Assistant U.S. Attorney told Mollo that he was not an agent--which is relevant but not controlling, id. § 1 and comment (b)--or that Mollo exceeded his instructions in a predictable manner, as agents often do, id. § 230 and comment (b). But common law agency rules are merely an available and not a controlling touchstone.
 
 
 20
 In the Massiah cases, the Supreme Court has sought to draw a line between government-instigated interrogations of a defendant in the absence of his lawyer and other means by which the government might come into possession of admissions by the defendant. Where the government asks a jail mate to report incriminating statements by anyone but has in no way focused the jail mate's attention on an individual defendant, it is a stretch to describe the jail mate's inquiries of the defendant as "government interrogation." Thus, we think the approach taken by the Second and Eighth Circuits, see note 2, above, is faithful to the main thrust of the Massiah precedents.
 
 
 21
 Further, the Second and Eighth Circuit approach gives better guidance to law enforcement authorities on an issue that has no single "right" answer. Our concern with the Third Circuit approach--in which the lack of focus on the defendant is simply "a" factor--is that it leaves the authorities, and the lower courts, somewhat in the dark as to just how to decide such cases. The government enlists jailhouse informers often enough that it is better to have clear ground rules for what they can or cannot do. Where a jail mate simply agrees to report whatever he learns about crimes from other inmates in general, we think there is not enough to trigger Massiah. Since Mollo's courtroom testimony as to LaBare was all based upon what Mollo learned before April 11, 1997, when the government revealed to Mollo a special interest in LaBare, Massiah was not violated even if Mollo's follow-up questions went beyond mere listening.
 
 
 22
 This may be a close call as to Mollo, given conflicting precedent. It is therefore useful to add that no such doubt infects the testimony of Chaloux. Chaloux had not yet received any instructions from government officials and was not even arguably a government agent when he collected the only statements by LaBare that the district court admitted. And, taking Chaloux's testimony together with the rest of the evidence, admitting Mollo's testimony--if error at all--would be harmless error even under the "beyond a reasonable doubt" standard applied to constitutional errors. Milton v. Wainwright, 407 U.S. 371, 377-78 (1972); Chapman v. California, 386 U.S. 18, 24 (1967). Why this is so can be quickly summarized.
 
 
 23
 In describing the government's evidence against LaBare at the outset of the opinion, we have stressed the high points: that LaBare left on the day of the robbery with a gun, saying that he planned to collect some money; that the victim unequivocally identified LaBare at trial as the culprit; that two friends of LaBare (the Woods) said that LaBare had essentially confessed to them and tried to obtain false alibi evidence from them; that LaBare had confessed his involvement to Chaloux and sought Chaloux's aid in silencing his then-girlfriend, Fournier; and that some pieces of circumstantial evidence (a gun magazine in LaBare and Fournier's house) were consistent with LaBare's involvement.
 
 
 24
 At the same time, the government's case was admittedly weakened by shortcomings in the testimony of Fournier (her mental state) and Warren (his equivocal identifications of the culprit on two occasions prior to trial and his identification of a car of a different color than the girlfriend's Subaru seen leaving the scene of the robbery and shooting). And Chaloux, of course, had ample reason to fabricate, although some of the detail may sound convincing. But the Woods were not effectively impeached, and the cumulative weight even of the shakier testimony (Fournier, Warren, and Chaloux) is considerable. In the end, multiple sources show LaBare's involvement in the crime and multiple sources confirm his efforts to cover it up or to suppress evidence. His conviction was therefore certain enough to make the inclusion of Mollo's testimony harmless.
 
 
 25
 LaBare's remaining issues on appeal both concern his sentence. That sentence was 327 months, the top of the range prescribed by the guidelines for a defendant with an offense level of 34 and a criminal history category of VI (the highest category). Properly, LaBare does not challenge his offense level. Here, the court found that the most closely analogous guideline describing LaBare's "other felony offense" was that for assault with intent to commit murder, U.S.S.G. § 2A2.1 (base offense level of 28),[3] and two further adjustments, id. §§ 2A2(b)(1), § 3C1.1, brought the offense level to 34.
 
 
 26
 The criminal history category is a different matter. By the time of LaBare's sentencing, he had also been convicted of the state robbery and attempted murder charges in the Warren shooting. The presentence report calculated LaBare's criminal history category on two different bases. First, it found that his prior criminal history points computed under chapter 4A added up to 13 points, which is the minimum amount needed for category VI status. Separately, the report found that LaBare had three convictions for crimes of violence prior to his commission of the felon-in-possession offense, which automatically placed him in category VI as an armed career criminal. 18 U.S.C. § 924(e); U.S.S.G. § 4B1.4. The district court found that both grounds independently supported the category VI designation.
 
 
 27
 The focus of the dispute here is whether a specific prior conviction of LaBare may be counted against him on either basis of calculation. Among his various convictions described in the presentence report was a 1992 conviction and three-year sentence in Maine state court for the crime of terrorizing with a dangerous weapon. Unless this conviction is counted, LaBare has less than the 13 points needed for category VI under chapter 4A; and without it he has only two other violent felony convictions committed prior to the ammunition offense.
 
 
 28
 LaBare argued in the district court, and argues again here, that this 1992 conviction was obtained in violation of his right to counsel and therefore should not be considered for the purpose of sentencing. See Custis v. United States, 511 U.S. 485, 487 (1994); United States v. Cordero, 42 F.3d 697, 701-02 (1st Cir. 1994). What happened at LaBare's trial for terrorizing is not disputed. LaBare had been assigned counsel (Joanne Kroll) to represent him at that trial. Part way through the trial, he asked the trial Judge for a continuance to obtain new counsel because of a disagreement with Kroll. The trial Judge made an effort to obtain substitute counsel without delaying the trial but, when this failed, the trial Judge gave LaBare the choice between proceeding pro se or continuing with Kroll, whom the court found to be providing proper assistance.
 
 
 29
 LaBare, insisting that he wanted new counsel, refused Kroll's further representation (she became his standby counsel) and began to represent himself--despite the trial Judge's warning to LaBare "that even a lawyer has a fool for a client if he chooses to represent himself." After some time, LaBare declared that he was not qualified and did not want to represent himself. The trial Judge asked Kroll if she was willing to resume full representation, but she declined; the Judge thereupon told LaBare that he was to continue representing himself, using Kroll as standby counsel if he wanted advice.
 
 
 30
 Against this background, the district court concluded that LaBare had not been denied his right to counsel in the state trial. LaBare now attacks this Conclusion on the double ground that his decision to proceed pro se was neither voluntary nor intelligent (i.e., informed). The first branch of this argument is plainly without merit. A mid-trial request to change counsel, where there is no showing that existing counsel is ineffective,[4] is a matter for the trial court's discretion. United States v. Pierce, 60 F.3d 886, 890-92 (1st Cir. 1995), cert. denied, 518 U.S. 1033 (1996). Since LaBare was free to continue with Kroll, his decision to represent himself was as voluntary as it needs to be. See United States v. Kneeland, 148 F.3d 6, 11-12 (1st Cir. 1998); Maynard v. Meachum, 545 F.2d 273, 278 (1st Cir. 1976).
 
 
 31
 The more potent claim made by LaBare is that he was not adequately warned of the dangers of self-representation. This may at first appear a peculiar claim: after all, LaBare was clearly warned that he would be "a fool" to represent himself, and he nevertheless insisted that he would represent himself rather than continue with competent counsel already representing him. Nevertheless, a body of precedent has been built around the requirement that a waiver of counsel under the Sixth Amendment be not only voluntary--as LaBare's was--but also intelligent. Faretta v. California, 422 U.S. 806, 835 (1975); Tuitt v. Fair, 822 F.2d 166, 176 (1st Cir.), cert. denied, 484 U.S. 945 (1987).
 
 
 32
 According to Faretta, a defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes wide open.'" Faretta, 422 U.S. at 835 (quoting Adams v. United States ex rel. McCann, 317 U.S. 269, 279 (1942)). Further, this court has said in Maynard that for a waiver to be intelligent, a defendant must have a sense of the magnitude of the undertaking and the 'disadvantages of self-representation,' [Faretta, 422 U.S. at 835], an awareness that there are technical rules governing the conduct of a trial, and that presenting a defense is not a simple matter of telling one's story.... In addition, the accused should have a general appreciation of the seriousness of the charge and of the penalties [to which he may be exposed].... 545 F.2d at 279. But Maynard also said that a waiver need not be based on "explicit bench warnings or a colloquy on the record," id. at 277, and later decisions have upheld waivers where the defendant had enough training or experience to know that he faced serious charges and that a trial is not merely "a simple matter of telling one's story."[5]
 
 
 33
 LaBare was not a novice: his trial for terrorizing with a dangerous weapon occurred in 1992 when he was 37 years old and, prior to that trial, LaBare had already been convicted after trial for conveying a weapon into a federal penal facility (at age 20), armed robbery (at age 23), and theft (at age 36). Absent unusual circumstances, a defendant who has previously sat through criminal trials of his own has to know that trying a case involves examining witnesses, making objections, and observing rules of procedure and evidence; and a defendant who has served time for serious prior offenses must know that a new charge of terrorizing with a dangerous weapon (two counts) and assault (one count) are serious matters and could involve new imprisonment. In deciding to represent himself, LaBare made a dubious choice, but it was not an ignorant choice.
 
 
 34
 Having validly decided to represent himself, it is also clear that later in the trial LaBare changed his mind. There may be cases where, at least when the change of mind occurs well before trial, a defendant is entitled to a second chance. Cf. United States v. Proctor, 166 F.3d 396 (1st Cir. 1999). But LaBare had no right to a new appointment of counsel in mid-trial and, indeed, did not ask for one: his later request was for an outright mistrial. We thus join in the view of the district court that LaBare was not denied his Sixth Amendment rights--a judgment shared by the Maine Judicial Supreme Court which rejected LaBare's similar attack on direct appeal. Maine v. LaBare, 637 A.2d 854 (Me. 1994).
 
 
 35
 The final issue originally raised by LaBare on this appeal was whether the district court erred in refusing to decide whether LaBare's federal sentence should run concurrently (as LaBare wished) or consecutively to LaBare's state sentence for robbery and attempted murder of Warren. This state sentence, nominally 40 years, had already been imposed prior to the federal sentencing in this case. When asked by LaBare to make the federal sentence run concurrently, the district court replied that this "is a matter that is not for me to decide, it's for the general sentencing law and the Bureau of Prisons." LaBare says that this issue is now moot, because the state court subsequently amended its judgment to make the state sentence run concurrently with the federal sentence.
 
 
 36
 Nevertheless, we think it useful to point out that LaBare was entitled to a ruling by the district court. Although at one time the Bureau of Prisons had independent authority to begin a federal sentence before a defendant was released from state prison, U.S.S.G. app. C, amend. 535, at 371, the guidelines now give Judges specific instructions regarding treatment of a defendant who is federally sentenced while already "subject to an undischarged term of imprisonment." Id. § 5G1.3. In certain circumstances, the new sentence must be consecutive; in others, it must be concurrent; and in still others, the district Judge may do either, or may make the sentence partly concurrent, as needed to achieve "a reasonable punishment." Id.
 
 
 37
 LaBare says he was entitled to a concurrent sentence. See U.S.S.G. § 5G1.3(b). The government thinks that the district court could have made the sentence consecutive, see id. § 5G1.3(c), but admits that a determination by the court was required. Since both agree that the new state court judgment satisfies LaBare's demand for a concurrent sentence, we do not pursue the matter.
 
 
 38
 Affirmed.
 
 
 
 NOTES:
 
 
 [1]
 Massiah, 377 U.S. at 206; see also Patterson v. Illinois, 487 U.S. 285 (1988); Michigan v. Jackson, 475 U.S. 625 (1986); Maine v. Moulton, 474 U.S. 159 (1985); United States v. Henry, 447 U.S. 264 (1980).
 
 
 [2]
 Compare Moore v. United States, 178 F.3d 994 (8th Cir. 1999) (general agency insufficient), and United States v. Birbal, 113 F.3d 342, 346 (2d Cir.) (same), cert. denied, 118 S.Ct. 433 (1997), with United States v. Brink, 39 F.3d 419, 423-24 (3d Cir. 1994) (appearing to consider multiple factors), and Creel v. Johnson, 162 F.3d 385, 393-94 (5th Cir. 1998) (same), cert. denied, 119 S.Ct. 2027 (1999).
 
 
 [3]
 Although the base offense level for possessing ammunition would normally be less than 34, U.S.S.G. § 2K2.1, a cross reference directs that possession of ammunition in connection with another felony offense warrants the use of the latter's guideline if a higher offense level would result, id. § 2K2.1(c).
 
 
 [4]
 LaBare also argues that the state court Judge did not conduct an adequate inquiry into LaBare's complaint about his counsel. See Maynard v. Meachum, 545 F.2d 273 (1st Cir. 1976). In fact, the Judge repeatedly asked LaBare to explain his disagreement with his lawyer (he claimed that she had told him that he should plead guilty) and then concluded that the lawyer's representation was adequate.
 
 
 [5]
 See United States v. Campbell, 874 F.2d 838, 845-47 (1st Cir. 1989) (defendant himself was a criminal lawyer); United States v. Hafen, 726 F.2d 21, 24-26 (1st Cir.) (defendant had two years of law school and previous criminal conviction), cert. denied, 466 U.S. 962 (1984).