USCA1 Opinion

 

United States Court of Appeals

For the First Circuit

No. 01-2229

UNITED STATES OF AMERICA,

Appellee,

v.

DEBORAH WOODARD,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

 Lynch, Circuit Judge,

Cambpell and Bownes, Senior Circuit Judges.

 Timothy G. Watkins, with whom Owen S. Walker, Federal Public
Defender, was on brief for appellant.

 

 John A. Wortmann, Jr., Assistant U.S. Attorney, with whom
Michael J. Sullivan, United States Attorney, and George W. Vien,
Assistant U.S. Attorney, were on brief for appellee.

May 31, 2002

 BOWNES, Senior Circuit Judge. Defendant-appellant
Deborah Woodard appeals from a criminal judgment entered against
her on the ground that she was deprived of counsel in violation
of the Sixth Amendment to the United States Constitution. On
the eve of trial, Woodard requested substitution of counsel. 
The court refused and told Woodard that she could either
continue with her present counsel or represent herself; if she
represented herself, her counsel would remain available to help
her if she wished. Later, the court told Woodard she could
bring in new counsel if she could do so in time for trial. 
Woodard decided to represent herself at a suppression hearing
and at trial, and the court dismissed counsel before the jury
was selected.

 A jury convicted Woodard of one count of possession
with intent to distribute cocaine base in violation of 21 U.S.C.
§ 841(a)(1). Although we are troubled by the district court's
dismissal of Woodard's counsel, we hold that it did not rise to
the level of reversible error. Accordingly, we affirm the
judgment.

I. BACKGROUND

 On November 16, 1999, a criminal complaint issued
charging Woodard with possessing cocaine base with intent to
distribute in violation of 21 U.S.C. § 841(a)(1). Woodard was
represented by a private attorney, Harold Hakala. On December
2, 1999, a federal grand jury in the District Court for the
District of Massachusetts returned a one-count indictment
charging Woodard with the aforementioned offense. 

 Over the next fourteen months, the district court held
two scheduling and pretrial conferences that Woodard did not
personally attend. Trials were scheduled for April 24, 2000,
and for September 25, 2000, but both dates were continued when
Woodard indicated she wished to change her plea. At least three
change of plea hearings were scheduled, then continued.

 At the second conference (styled as a "final" pretrial
conference), on July 17, 2000, the district court set a trial
date of September 25, 2000. The court set September 5 as the
deadline by which Woodard should file a motion to suppress
evidence. No such motion was filed. The trial did not take
place on September 25, but instead was generally continued while
a presentence investigation was conducted. 

 The next status conference was on January 3, 2001. 
Woodard was present at the hearing. The court announced that it
was setting the case for trial on January 16, 2001. Hakala
immediately made an oral motion to withdraw and communicated
Woodard's request that the court appoint new counsel. He
stated:

 Your Honor, Ms. Woodard has made it clear to
me that she would like to have counsel
appointed to represent her from here on out. 
I am private counsel. I think that it's a
fair representation to say that the
attorney-client relationship has been
difficult for several months. It's been
strained. I've tried to keep it together. 
I don't mean to suggest that it's Ms.
Woodard's fault that it's fallen apart, but
I think it's reached a point where it's
irretrievable breakdown. I think that in
good conscience I could no longer continue
to represent Ms. Woodard. 

The court sought clarification from Woodard:

 Ms. Woodard, again what passes between you
and your attorney is private to you. And so
by asking you questions myself, I'm not
trying to get into what passes between you
and your attorney. But this case is
scheduled for trial. We've been ready - -
we've been getting this case ready for
trial. 

 

 Now, I've scheduled the case for trial a
week from Tuesday. Now, it's very
surprising to me that now I hear for the
first time that you want another lawyer. 
You tell me why - - but you don't have to go
into what passes between you - - you tell me
why you don't want this lawyer who's worked
the case up to trial to represent you.

Woodard responded that "our relationship is strained and we're
not having a good attorney-client relationship. It's not
working out." The court asked what Woodard thought another
lawyer would do for her that her attorney was not doing. 
Woodard replied that "[M]aybe I would just feel a little bit
more comfortable with another relationship. It's just not
working out for me." The court asked, "Is that it?" and Woodard
answered affirmatively. The court denied the oral motion:

 This seems to me to be a transparent effort
at the eleventh hour to get a continuance. 
It's denied.

 Now, he's your attorney, he's who you have
selected as your attorney, and the case is
going to trial a week from Tuesday on the
16th.

 Now, that's the motion, it's denied.

Hakala attempted to intercede:

 Respectfully, I think Ms. Woodard, I'm just
guessing, but I have a sense -- I appreciate
your viewpoint. I mean, it's well-founded. 
Obviously, she hasn't said anything
specific. She has lost complete confidence
in me. She's probably -- she may be
embarrassed to even say that in open court. 
But I'm not afraid to say it. She's
expressed it to me many times. We can't
even -- there is -- there are many times
that counsel finds himself in a position
with a strained relationship, if you will,
between his client and himself. It's
happened many times, it's okay, and I've
gone forward that way. This is a case where
I don't think that Ms. Woodard will be best
served by having me as counsel at trial. 
She has no confidence. She has challenged
everything I've done, frankly. And that's
okay, but she's done so with a view that I'm
not doing what's right. And it's gone on
for months.

 And so perhaps I've been remiss in not
bringing it forward earlier to the Court's
attention and let you know that there is a
strained relationship, but I thought maybe
we could proceed. It looked like it was
going to be a plea. We had done some
preliminary work on some other issues. They
fell through.

The court responded:

 Well, I ask her, I ask her what the problem
is and she says she would feel more
comfortable. That's not a ground for, at
this time, changing lawyers.

 Now, the fact is she may disagree with you. 
But I assume you're working with what you
have in this case and I have no reason to
impugn either your competence or your
preparedness and, therefore, there's no
reason in the interests of justice to
continue this trial. I don't hear any. She
elected you initially. We're going forward
on the 16th. 

 On January 16, 2001, Hakala again reported to the
district court that he felt he couldn't represent Woodard,
stating that she was now refusing to speak with him. Hakala
submitted a letter from Woodard addressed to the court:

 The issue between Mr. Hakala and myself is:
I would like to have a suppression hearing
before I go to trial or plea. I have asked
Mr. Hakala several times about obtaining a
complete discovery package that would show
the police report of the couple who made the
alleged statements against me. The drug
analysis and the disposition of their cases. 
Also my travel documents that would show
when I was out of the country.

 Mr. Hakala feels that I would lose the
motion based on a appeal that he lost. 
Commonwealth v. Singer, that is his thought
based on his defeat. There are enough
mitigating factors to warrant a different
situation in my case. On Jan. 3th when we
came to court I wanted to filed a motion to
suppress, he wanted me to plea guilty. 
Because we cannot agree, he asked to be
removed from the case, I asked for new
counsel.

 We only had 5 minutes to talk down stairs
because transportation was waiting. I
called on Monday, but there was an emergency
code in the prison and I could only talk for
a few minutes. I try to call on Tues. &
Wed. No answer. On Thur. I spoke to his
secretary who informed me Mr. Hakala would
be in court all day, "to call back Fri. at
one clock" [sic]. I called Friday, she
answered the phone and hung up, I called
right back she hung up again. I called at
two clock she answered and said that "Mr.
Hakala left for the day" and said "he would
see me in court Tuesday".

 As I beg your honor for compassion due to
the abrasive & disconcerting attitude of my
counsel, whom has manifested his biasness
toward me, even extending to deny me access
to minimal verbal communications as before
mentioned. The time that has been left is
insufficient. Nothing in the least has been
resolved. The Courts position Justice for
all extendeds to the latlitude of discretion
for counsel to the accussed. Justice in the
broadest sense of the word, would be denied
me, if an opportunity to secure competent
legal advice isn't obtained. I have no
faith in my counsel. I am therefore asking
the U.S. Court to assist & allow me a new
counsell, to pick up from this point and
move forward to the conclusion of

(Punctuation and paragraph format added; errors in original.) 
The letter breaks off in mid-sentence and is signed by Woodard. 
Woodard also handed the court a second letter, from Hakala to
her, which responded to her inquiry regarding a suppression
motion six months earlier. The court treated Woodard's letter
to the court as a Motion to Change Counsel, which it denied. 

 After reading the letter, the district court began
questioning Woodard directly about evidence suppression issues. 
Woodard questioned the affidavit in support of a search warrant
used to seize evidence in her case. Cautioning that it was not
getting involved in plea bargaining, the district court asked
the government if it might allow Woodard to tender a conditional
plea. The court explained the mechanics of a conditional plea
and urged Woodard to consult with counsel. The court then
announced that if a plea agreement was not reached, the trial
would proceed. It told Woodard that she had three choices:

 You can go ahead and have Mr. Hakala
represent you, and as I say I think he's
prepared to do it, and the trial will
proceed. You can represent yourself. You
have that right to represent yourself. And
I will treat you with every courtesy. I
can't cut you any slack, but you can
certainly represent yourself. And we'll
have Mr. Hakala stay right there and advise
you if you want his advice, or you can cut
yourself free of him and represent yourself. 
But trial there will be, or some other
resolution. So have that in mind.

 Hakala reported to the court that Woodard wanted to
enter a conditional plea. He asked to withdraw, but stated that
he "would be willing to stay in the courtroom in case any
questions arise as to what my involvement was or whatever was
represented to her." Woodard assented to this arrangement and
the court allowed Hakala to withdraw, "for the moment," while
Woodard embarked upon the plea colloquy pro se. Hakala remained
in the courtroom during the plea colloquy; the court advised
Woodard that she could consult with him at any time.

 In the plea colloquy, the court confirmed information
about Woodard's background, including the fact that she had
attended college. It also confirmed her understanding of the
nature of the charges and the penalties she faced. The court
then explained to Woodard that she could (1) conditionally plead
guilty to the indictment with a mandatory minimum sentence of
120 months in prison, (2) plead guilty to an information
charging a different offense and set of facts for a lower
government recommendation, or (3) go to trial. During this
colloquy the court and Woodard also discussed her right to "face
her accusers" and its implications for a suppression hearing and
trial. 

 Woodard asked about moving to suppress the evidence
found in her home as the result of an executed search warrant. 
She voiced concern that if she went to trial, she would not be
allowed the opportunity to challenge the search warrant used. 
The court decided that the jury should be selected first, and
then the motion to suppress heard.

 The court then conducted a colloquy with the defendant
concerning her decision to represent herself:

THE COURT: Now, let me explain this to you. It's a big mistake
to represent yourself. Let me tell you. You have
a right to. And I'll let you represent yourself on
the motion to suppress. But I'll let you represent
yourself on the whole case. You have a
constitutional right to represent yourself. But you
don't know how to do this. You don't know how to
pick a jury. You don't know, you don't know how to
ask questions like a lawyer does. And while that's
your constitutional right it's not going to help you
to represent yourself.

 How about having Mr. Hakala handle the trial and you
do the motion to suppress?

WOODARD: Judge Young, I've asked for a change of counsel. 
I've asked you for a change of counsel twice. I've
asked you for a change of counsel.

THE COURT: And I've denied it. Fine. That's how you want do
it [sic].

WOODARD: I mean, that was one of the big issues with me was
may I have a change of counsel. Because I wanted to
attack the suppression, a long time ago I wanted to
attack the suppression. So that's why, one of the
disagreements Mr. Hakala and I had was about the
search warrant.

THE COURT: The fact that I'm allowing you to do this does not
for a moment suggest that I think that any of the
counsel Mr. Hakala gave you - - 

WOODARD: I understand.

THE COURT: - - is wrong. This whole thing may be - - my mind
is completely open - - it may be a waste of time. 
But, the reason I'm taking so much time is primarily
because it's your liberty that's involved.

WOODARD: Uh-huh.

THE COURT: And I want to be clear, I want to be clear that you
have had a fair shake at every step. I'm telling
you, I think this business about change of counsel
is all just to delay things.

WOODARD: No.

THE COURT: And if I give you - - he's a competent counsel,
we'll let him handle the motion to suppress. Or you
can handle it if he has no faith in it. But one way
or another we're going to go forward.

 The court then moved on to scheduling issues. Woodard
explained that she would not be ready to litigate the motion to
suppress by the next day. The court responded that "[y]ou're
going to have to have it ready."

 The court moved on to jury selection. Woodard first
asked that Hakala pick the jury, but later said she would pick
her own jury. The court explained the mechanics of picking a
jury to defendant and the jury venire arrived. After the venire
filed into the courtroom, the following exchange occurred:

 CLERK: Is Mr. Hakala excused?

 THE COURT: He's excused.

 

 COUNSEL: Thank you, your Honor.

 THE COURT: Thank you, sir.

Woodard did not object to Hakala's dismissal.

 After jury empanelment, the court gave the jurors
preliminary instructions and dismissed them for the day. The
court discussed the mechanics of the suppression hearing and its
order that the government produce the witnesses defendant
wanted. Woodard complained to the court that "I know that I
won't be able to do anything and I won't have anybody to confer
with about these witnesses . . . I don't have anybody to talk
to about, about the witnesses." The court replied that she did
not have to worry about getting the witnesses because he had
directed the government to produce them. Woodard asked if she
could get her own lawyer. The court replied, "You get a lawyer
between now and tomorrow and I'll recognize him." 

 Just before the hearing on Woodard's oral motion to
suppress, the government provided the court with some discovery
materials; it described them as "a rehash of a lot of the
discovery that we provided to Ms. Woodard, but I just want to
make sure she has it physically." On January 17, 2001, the
court heard Woodard's oral motion to suppress evidence and
denied it immediately. 

 When the case was called for trial the following day,
Woodard stated that she was not ready to go forward:

WOODARD: I'm not ready to go forward today, Judge Young. 
I don't feel I'm able to represent myself and I
feel I need a lawyer.

THE COURT: You asked to represent yourself.

WOODARD: I don't feel I'm able to.

THE COURT: I told you that it was very unwise to represent
yourself.

WOODARD: Yes. I don't feel I'm able to represent myself.

THE COURT: Beg pardon?

WOODARD: I don't feel I'm able to represent myself.

THE COURT: Well, you dismissed Mr. Hakala, your counsel. 
And I told you the choice was to represent
yourself or have Mr. Hakala represent you. You
dismissed him. I offered Mr. Hakala to sit there
at counsel table, let you do it and have him
advise you. You rejected that. Now we're going
forward.

WOODARD: I don't have a lawyer and I cannot represent
myself. And I did not reject him. I came again
and tried to talk to him. He said he feels it
was best that he did not represent me. He asked
to leave and he left.

 But I cannot represent myself. I don't know the
procedure. I don't know the - - I can't
represent myself. I can't.

THE COURT: Well, ma'am, I must tell you that I think that
your conduct here is designed solely to frustrate
this trial going forward. You had a competent
lawyer - - 

WOODARD: No.

THE COURT: - - who represented to the Court that he was
prepared to go forward with your defense.

 Now, you simply cannot rule the proceedings in
this Court. I have bent over backwards. I have
allowed you to have the hearing that you
requested. I have told you we were not going to
continue the trial. I have advised you how
unwise it is to represent yourself. Now we are
going forward.

 Let me explain to you how we're going to proceed.

WOODARD: Judge Young, may I say one other thing. I have
not used this as a stall method. I asked for
that hearing in June. I can show you paperwork
that documents I've asked for it in June. I have
not tried to stall things. I have tried to work
with Mr. Hakala. If you read the letter I asked
him, I asked for this motion to suppress in June. 
I have done nothing to try to - - I have tried to
work with him. I've done everything I can to
work with him. I am not trying to stall this
trial in the least. I am in a position where I
don't want to be in that position. Why would I
try to stall it? I've tried to get this to
trial. I asked him to go to trial many times. 
He keeps writing me not to have a trial, not to
have a trial. I've asked for a trial many times
with him. I have not tried to stall this. I
have not.

 Look at the letters that have been written back
to me and you'll see that I'm the one that asked
for a trial. I'm the one that asked for a
motion.

THE COURT: And now - -

WOODARD: I asked for these things.

THE COURT: Why then did you dismiss Mr. Hakala when I told
you - - 

WOODARD: I didn't exactly - - well, you asked me could I
work with him. I talked to him and I asked him
again. He said no, that he felt it was better
that he didn't represent me being the fact that I
had already said something to you without him, he
felt it was best that he did not represent me. 
He asked you to leave the courtroom. I never
officially dismissed Mr. Hakala.

THE COURT: The record - -

WOODARD: Mr. Hakala.

THE COURT: I think the record demonstrates to the contrary
and I have fully advised you.

 Now, here's how we're going to proceed. If you
have any questions about procedure, as I told
you, you ask me.

WOODARD: I don't know the procedure. That's one of the
big things that - -

THE COURT: I'll - - 

WOODARD: I don't know the procedure. I don't even know
when to object and when to ask questions.

THE COURT: Then listen to me because I'm going to tell you.

 

 The court went on to discuss the mechanics of the trial
and the verdict slip in light of Apprendi v. New Jersey, 530
U.S. 466 (2000). The court asked defendant if she had any
questions:

WOODARD: I just received copies of reports, copies of
things, that I haven't even been able to look at,
that I don't even have, I never even had before. 
I, I don't have a complete file of my case
because I was never given a complete file of my
case. I prepared questions this morning that I
was, that I was not allowed to bring in things
that I had, the notes that I had I was not
allowed to bring in. Because it was not a, ah, a
attorney written thing saying please allow me to
bring in or anything like that. I don't have
even a complete file of my case.

THE COURT: Well, if there's something that you want to
introduce in evidence you let me know what it is.

WOODARD: I don't have a complete file of my case. I
haven't even -- I haven't -- they've handed me
things as I was coming in.

THE COURT: I have to know specifically what we're talking
about. Just saying I don't have a complete file
-- 

WOODARD: In my file I have a copy of my arrest record. I
don't have a copy of everything. He handed me
some paperwork.

THE COURT: What is it that you want?

WOODARD: I don't know what I'm supposed to have. I know
the papers he handed me haven't been submitted to
me to look at.

THE COURT: Well, you look those papers over. I imagine that
he's going to want to put those in evidence, or
some of them in evidence. Before I let the jury
see any of them, I will ask you. I always do
that.

 All right.

WOODARD: I have paperwork that he handed me yesterday that
I still am looking over because he just handed it
to me yesterday. I haven't had a chance to even
go over the records of this file, this case.

THE COURT: Ma'am, I have to tell you that I think I've
explained everything to you completely fairly.

WOODARD: You have explained it but I haven't had a chance
to read it.

THE COURT: And I have to tell you further --

WOODARD: I haven't had a chance to go over anything.

THE COURT: Listen to me. I'll tell you further, despite
what you say, I think you're stalling here. You
wanted a trial. You wanted to conduct it.

WOODARD: No, I didn't want to conduct it.

THE COURT: Well, you say that now.

WOODARD: I wanted a lawyer to conduct it. I just had a --

THE COURT: But you would not go forward with the lawyer --

WOODARD: I tried to go forward.

THE COURT: that you had.

WOODARD: I tried to go forward with Mr. Hakala.

THE COURT: No.

WOODARD: I talked to him a couple of times that day. I
did try to go forward with him.

THE COURT: I believe the record speaks to the contrary. 
We're going forward. Let's see if the jury's
present.

WOODARD: I'm not ready to go to trial. I'm not ready.

 The jury was sworn and trial began. The government
presented evidence and rested the same morning. Woodard rested
after entering some documents and presenting no witnesses. The
government and defendant made closing arguments and the court
instructed the jury. (1) After deliberating for more than an hour, 
the jury returned a guilty verdict. 

 The court appointed counsel to represent her for
sentencing and any post-trial matters. On August 21, 2001, the
court sentenced Woodard to a term of imprisonment of 135 months,
to be followed by a 36-month term of supervised release. 

II. DISCUSSION

 Woodard asserts several interrelated points of error:
that the district court wrongly denied her motions for
substitution of counsel; that it allowed her to proceed pro se
after inadequate colloquy; that it dismissed standby counsel
after promising Woodard his assistance; and that it refused to
allow her to revoke her waiver of counsel before the trial
started. 

A. The Sixth Amendment right to counsel

 Representation by counsel is a right of the highest
order. United States v. Proctor, 166 F.3d 396, 401 (1st Cir.
1999). In Proctor, we mapped out the complex relationship
between a defendant's Sixth Amendment right to counsel and her
right to self-representation. Id. at 401-02. There, we
affirmed that the right to counsel is paramount: "Where the two
rights are in collision, the nature of the two rights makes it
reasonable to favor the right to counsel which, if denied,
leaves the average defendant helpless." Id. at 401 (quoting
Tuitt v. Fair, 822 F.2d 166, 174 (1st Cir. 1987)). 

 Nonetheless, the Sixth Amendment does not provide an
absolute right to counsel of a defendant's choosing. United
States v. Kneeland, 148 F.3d 6, 12 (1st Cir. 1998); see also
Wheat v. United States, 486 U.S. 153, 159 (1988) ("[T]he
essential aim of the [Sixth] Amendment is to guarantee an
effective advocate for each criminal defendant rather than to
ensure that a defendant will inexorably be represented by the
lawyer whom he prefers.") It is well-established that it is
within the district court's discretion to force a defendant to
choose between proceeding to trial with an unwanted attorney and
representing herself. See Proctor, 166 F.3d at 402 and cases
cited. 

 In weighing a defendant's right to choose her own
counsel, we take into consideration its impact on "reasonable
and orderly court procedure." United States v. Poulack, 556
F.2d 83, 86 (1st Cir. 1977). Specifically, "a defendant has no
right to representation by a particular attorney when such
representation would require undue delay." United States v.
Hallock, 941 F.2d 36, 44 (1st Cir. 1991); see also United
States v. Allen, 789 F.2d 90, 92 n.4 (1st Cir. 1986); Maynard v.
Meachum, 545 F.2d 273, 278 (1st Cir. 1976). Thus, when a
defendant seeks new counsel, the court must balance her
"interest in retaining counsel of his choice against the
public's interest in the prompt, fair and ethical administration
of justice." United States v. Richardson, 894 F.2d 492, 496
(1st Cir. 1990) (quoting United States v. Panzardi-Alvarez, 816
F.2d 813, 817 (1st Cir. 1987)). "Only an unreasoning and
arbitrary insistence upon expeditiousness in the face of a
justifiable request for delay violates the right to the
assistance of counsel." Morris v. Slappy, 461 U.S. 1, 11-12
(1983) (internal quotation marks and citation omitted). 

B. Woodard's motions for substitution of counsel

 Woodard first argues that the district court erred in
denying her motions for substitution of counsel. We review the 
denial for abuse of discretion. Proctor, 166 F.3d at 401. (2) We
accord "extraordinary deference" to the district court's
decision where, as Woodard concedes here, the allowance of the
motion would necessitate a last-minute continuance. United
States v. Pierce, 60 F.3d 886, 891 (1st Cir. 1995). 

 In Allen, 789 F.2d at 92, we set forth the principles
governing cases in which a criminal defendant asks that
appointed counsel be replaced. When a defendant voices
objections to counsel, the trial court should "inquire into the
reasons for the dissatisfaction." Id. In evaluating whether a
district court's denial of motion for substitution of counsel
constituted an abuse of discretion, we consider the following
factors:

 the timeliness of the motion, the adequacy
of the court's inquiry into the defendant's
complaint, and whether the conflict between
the defendant and his counsel was so great
that it resulted in a total lack of
communication preventing an adequate
defense.

Id.

 As an initial matter, we have some question about the
applicability of the Allen factors to this case. Here, Woodard
was represented by private counsel. Unlike a defendant with
appointed counsel, she was not dependent on the court's
permission to replace Hakala. We see no reason why, if
dissatisfied with his representation, she could not have simply
fired him and retained a different lawyer before trial was
scheduled. This would have presented the trial court faced with
a motion by counsel to withdraw with a more palatable
alternative.

 Even assuming that the Allen test applies, Woodard does
not sufficiently demonstrate any abuse of discretion on the part
of the district court. First, her request for new counsel was
not timely. The issue was first raised at the status conference
on January 3, 2001, thirteen days before the trial date set by
the district court. After Hakala raised the issue of Woodard's
desire for different counsel, the district court inquired as to
why. Woodard's reason for her dissatisfaction with Hakala was
that their relationship was "strained," that it was "not working
out," and that she "would just feel a little bit more
comfortable with another relationship." Hakala took it upon
himself to elaborate, but added little in the way of substantive
explanation. All told, the reasons presented to the district
court in support of substitution of counsel on January 3 did not
adequately support Woodard's motion. See Allen, 789 F.2d at 93
(requiring defendant to provide the court with "a legitimate
reason for his loss of confidence"). (3)

 Woodard did not provide more explicit reasons for her
desire for new counsel -- e.g., her conflict with Hakala over
the motion to suppress -- until January 16, the first day of
trial. We have consistently held that requests for substitution
of counsel made on the day of trial are untimely. E.g.,
Richardson, 894 F.2d at 497-98; Tuitt, 822 F.2d at 172; Allen,
789 F.2d at 93. More specifically, the record indicates that
the conflict between Woodard and Hakala about the motion to
suppress was several months old and that their communication
difficulties had existed "for months"; yet Woodard offered no
explanation for why she did not complain earlier. See
Richardson, 894 F.2d at 497-498 (in determining that a request
for new counsel made the morning of trial was untimely, court
noted that defendant had two months to express dissatisfaction
with appointed counsel); United States v. Mangual-Corchado, 139
F.3d 34, 42 n.18 (1st Cir. 1998) (in affirming denial of motion
to replace counsel, court stated that defendant failed to act
until three weeks before trial, even though he claimed that
counsel had kept him waiting five or six months for documents).

 Second, we hold that the district court's inquiry was
adequate under the circumstances. The extent and nature of the
inquiry may vary in each case; it need not amount to a formal
hearing. See United States v. Prochilo, 187 F.3d 221, 229 n.8
(1st Cir. 1999). Here, after Woodard raised the issue of her
dissatisfaction with Hakala, the district court immediately
inquired as to the reasons for the dispute; determined that
Hakala was prepared to proceed to trial; and asked Woodard what
she believed the problem was. We have affirmed comparable
inquiries as adequate. E.g., Richardson, 894 F.2d at 497
(district court questioned lawyer and client regarding nature of
dispute and preparedness for trial); United States v. Torres,
793 F.2d 436, 438 (1st Cir. 1986) (court questioned defendant
on the reasons for his dissatisfaction); Allen, 789 F.2d at 93
(court "invited appellant to make a statement, listened to his
reasons for being dissatisfied with his counsel, and found them
to be without merit").

 Third, we are not convinced that Woodard demonstrated
a "total lack of communication" that would establish good cause
for substitution of counsel. See Allen, 789 F.2d at 92. Good
cause cannot be determined "solely according to the subjective
standard of what the defendant perceives." Id. at 93 (quoting
McKee v. Harris, 649 F.2d 927, 932 (2d Cir. 1981)). Loss of
trust, standing alone, is insufficient; rather, "[t]he defendant
must provide the court with a legitimate reason for his loss of
confidence." Id. 

 Here, Woodard's primary argument in support of good
cause was Hakala's failure to file a motion to suppress. The
district court determined that Woodard sought to suppress the
evidence seized from her house on the ground that a detective
included information in the search warrant affidavit that he
knew to be false. The court also considered her claim that she
was being prosecuted merely because she had traveled to Jamaica. 
Only then did it deny Woodard's request. 

 Without more, Hakala's failure to file a suppression
motion that he considered to be meritless does not constitute
good cause for substitution of counsel. An attorney is not
obligated to pursue weak options "when it appears, in light of
informed professional judgment, that a defense is implausible or
insubstantial." Tuitt, 822 F.2d at 172 (quoting Cepulonis v.
Ponte, 699 F.2d 573, 575 (1st Cir. 1983)). (4) 

 In sum, after consideration of the Allen factors, we
conclude that the district court did not abuse its discretion in
denying her motion for substitution of counsel. 

C. Woodard's decision to proceed pro se

 Woodard's next argument is that the district court
denied her right to counsel by permitting her to represent
herself. Specifically, she contends that the district court
failed to warn her of the pitfalls of self-representation as
required by Faretta v. California, 422 U.S. 806, 835 (1975). (5) 
We review the district court's decision that a defendant may
proceed pro se for abuse of discretion. Proctor, 166 F.3d at
401.

 A defendant who seeks to relinquish her right to
counsel must so state in unequivocal language. Faretta, 422
U.S. at 835. The waiver must be knowing, intelligent and
voluntary. Proctor, 166 F.3d at 401. The trial judge must
explicitly make the defendant "aware of the dangers and
disadvantages of self-representation, so that the record will
establish that he knows what he is doing and his choice is made
with eyes open." Faretta, 422 U.S. at 835 (internal quotation
marks and citation omitted). In determining whether there is a
competent waiver of the right to counsel, the judge "must
investigate as long and as thoroughly as the circumstances of
the case before him demand." Proctor, 166 F.3d at 402 (quoting
Von Moltke v. Gillies, 332 U.S. 708, 723-24 (1948)). We are
guided by the principle that "[c]ourts must indulge in every
reasonable presumption against waiver of the right to counsel." 
 Id. 

 The district court conducted the self-representation
colloquy after completing the plea colloquy. In the plea
colloquy, the court advised Woodard of the seriousness of the
charge against her and the penalties she faced; described
various substantive and procedural aspects of the trial,
including empanelment, the government's burden of proof, opening
and closing arguments, questioning of witnesses, the concept of
reasonable doubt, and the nature of the sentencing guidelines;
and confirmed her understanding of the plea process. The court
had additional information about Woodard by way of the pre-plea
presentence report (PSR), which described Woodard's college
training, business experience, and experience with the judicial
system (as evidenced by her prior convictions for drug
trafficking and other crimes).

 After Woodard announced her wish to proceed pro se, the
court warned her that "it's a big mistake to represent
yourself." It reminded her that she lacked the experience or
ability of an attorney: "You don't know how to pick a jury. 
You don't know . . . how to ask questions like a lawyer does." 
When Woodard held fast to her decision, the court suggested that
she allow Hakala to handle the trial or to empanel the jury.

 It is true that the district court's colloquy cannot
be fairly described as painstaking. In light of its knowledge
of Woodard's circumstances from its questioning and the PSR,
however, we think it was adequate to ensure that her waiver was
knowingly and intelligently made. See United States v. LaBare,
191 F.3d 60, 67-68 (1st Cir. 1999) (upholding waiver in which
defendant with prior convictions was told only that he would be
a "fool" for representing himself); Kneeland, 148 F.3d at 11
(upholding waiver in which the court told defendant that he
would be at a significant disadvantage if he proceeded pro se);
United States v. Benefield, 942 F.2d 60, 64-65 (1st Cir. 1991)
(defendant with seventh grade education effectively waived right
to counsel based on prior involvement in criminal trials). 

D. The district court's dismissal of Hakala

 Next, we consider the district court's dismissal of
Hakala after Woodard had waived her right to counsel. Woodard
did not object when the district court excused Hakala from the
courtroom. Accordingly, we review for plain error. Fed. R.
Crim. P. 52(b).

 Woodard had no entitlement to Hakala or to any other
attorney as standby counsel. "A defendant has no right to
hybrid representation." United States v. Nivica, 887 F.2d 1110,
1121 (1st Cir. 1989). Although a trial court may appoint
standby counsel against a defendant's wishes, it is not required
to do so. Kneeland, 148 F.3d at 13; see also United States v.
Webster, 84 F.3d 1056, 1063 (8th Cir. 1996) ("Appointment of
standby counsel is within the discretion of the district court,
and a pro se defendant does not enjoy an absolute right to
standby counsel.") 

 Woodard neither expressly asked for standby counsel nor
objected to Hakala's dismissal. When the district court
discussed Hakala's remaining in the courtroom, Woodard did not
assent to using his services. Nor did she accept Hakala's
assistance when the court suggested specific functions that he
might perform. When the district court offered that Hakala
could represent Woodard at trial while she handled the motion to
suppress, Woodard did not answer directly, but rather restated
her desire for different counsel. While initially Woodard
agreed to let Hakala select the jury, she later decided to
perform that task herself. 

 Woodard contends that because the court had told her
that one of her options was to represent herself with Hakala
present, her decision to proceed pro se was rendered involuntary
by the subsequent dismissal of Hakala. The record does not
support this argument. There is no indication that Woodard's
waiver of counsel, or any other action, was made in reliance on
the court's assurance that standby counsel would be available. 
Indeed, as her approval of the standby counsel idea came only
after Hakala had left and was unlikely to be available, it
suggests that her aim was to frustrate the trial process,
utilizing whatever argument was closest at hand at the moment.

 Still, we are troubled by the district court's
dismissal of Hakala without further inquiry. Where a district
court promotes the idea of a "hybrid representation" in which
defendant and counsel divide duties, a defendant might plausibly
claim to believe that declining counsel's services in one
capacity does not necessarily mean dismissing him altogether. 
Regrettably, the court did not attempt to clarify the situation
by consulting with Woodard before dismissing Hakala from the
courtroom. Our misgivings do not rise to the level of
reversible error, however, in light of the specific facts of
this case and our standard of review. 

E. Woodard's attempt to revoke her waiver of counsel

 Finally, Woodard contends that the district court erred
in denying her request for counsel just before the jury was
sworn on January 18, 2001. We review this decision for abuse of
discretion. United States v. Betancourt-Arretuche, 933 F.2d 89,
93-94 (1st Cir. 1991). Again, the standard of review is
particularly demanding where, as here, the defendant's request
necessarily requires a continuance. United States v. Ademaj,
170 F.3d 58, 65 (1st Cir. 1999) ("We accord 'extraordinary
deference' to trial court rulings on 'last-minute' requests for
a continuance."). 

 A district court may refuse a defendant's request to
withdraw from self-representation after a valid waiver "if a
defendant seeks counsel in an apparent effort to delay or
disrupt proceedings on the eve of trial, or once trial is well
underway." Proctor, 166 F.3d at 402; see also
Betancourt-Arretuche, 933 F.2d at 93-94 (request for eleventh-hour change in representation is within trial court's
discretion). At the time Woodard sought to revoke her waiver of
counsel, it was the scheduled day of trial and the jury had
already been selected. Woodard had rejected Hakala's services
as standby counsel and had not availed herself of the
opportunity to retain new counsel. The district court expressly
found that her request for counsel was an attempt to delay the
trial. In light of that court's "superior vantage point for
evaluating matters such as these," we owe considerable deference
to that finding. Pierce, 60 F.3d at 891. Accordingly, we see
no reason to disturb the court's denial of Woodard's request. 

III. CONCLUSION

 In sum, we find no reversible error in the district
court's treatment of Woodard's requests for substitution of
counsel, her decision to proceed pro se, and her waiver of self-representation. We remain troubled, however, by the court's
dismissal of Hakala after offering his services as standby
counsel, and we think the better practice is not to engage in
future similar dismissals absent consultation with the
defendant. 

 We affirm the judgment against Woodard on this ground
and on all other grounds presented. 

1. At a sidebar conference to discuss objections to the jury
charge, Woodard asked if she could enter some drug treatment
records into evidence. The court refused to admit them. 
Woodard stated that she did not realize how important they were
to her case.
2. Woodard contends that our review is plenary, citing
Proctor, 166 F.3d at 401. That case, however, centered on
ambiguity in the scope of the motion: whether the defendant had
requested counsel for the entire case or only for a motion to
dismiss. Id. That "unusual feature of uncertainty"
distinguished that case but is not present here. Id. In
Proctor, the pivotal issue was "of necessity . . . considered
for the first time on appeal," id.; here, the parties agree that
Woodard sought new counsel to litigate her motion to suppress
and trial, and the district court explicitly considered those
requests. Accordingly, the only issue before us is whether the
district court properly exercised its discretion in denying
Woodard's motions. 
3. Woodard contends that she did not speak about the specifics
of her problem with Hakala at the January 3 hearing because the
court stated that "what passes between you and your attorney is
private," and criticizes the court for conducting the colloquy
in open court. Insofar as she was concerned about the
government's presence, however, neither she nor Hakala requested
to speak ex parte. Moreover, any concerns about attorney-client
privilege did not prevent her from making explicit complaints in
open court on January 16.
4. In her letter submitted on January 16, Woodard also
referenced problems in contacting Hakala. The record indicates
that she had spoken with Hakala at least twice since the January
3 conference, as well as repeated communication about the motion
to suppress and other issues in the previous months. Hence, we
cannot conclude that this complaint constitutes good cause.

 Nor does her complaint that she did not receive discovery
materials suffice. Although she did not specify what she
thought was missing, the record indicates that she had received
copies of the search warrant materials. To the extent that
Woodard's January 16 letter suggested she wanted police reports
and laboratory certifications regarding individuals from whom
the police had received information used in procuring the search
warrant but whom the government did not intend to use as
witnesses at trial, the materials were not discoverable.
5. Woodard also contends that the district court's denial of
her motions for substitution of counsel rendered her decision to
proceed pro se involuntary. Because we hold that the district
court did not err in denying those motions, we conclude that the
decision to proceed pro se was not involuntary.